**UNITED STATES of America, Appellant,**

v.

**Guiseppe BARBERA, Appellee.**

**No. 566, Docket 74–2399.**

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1975.

Decided March 24, 1975.

Thomas P. O'Sullivan, Asst. U. S. Atty. (James M. Sullivan, Jr., U. S. Atty., N. D. N. Y., of counsel), for appellant.

Dennis B. Schlenker, Albany, N. Y. (Feit, Schlenker & Patack, Albany, N. Y., Fried, Fragomen & Del Rey, New York City, of counsel), for appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This is a so-called "border search" case. On December 31, 1973, the appellee, Barbera, an Italian citizen who had entered the United States through Canada, was detained by a border patrol agent when he failed to respond to questions regarding his citizenship during a "roving patrol" of a bus at the depot in Malone, New York.[1] He was led from the bus in custody, and at the request of the border patrol agent, he produced his passport for examination.[2] It revealed that Barbera did not possess any valid travel documents. He was then formally arrested and charged under 8 U.S.C. § 1325 with entering the United States by eluding inspection.

■ Relying principally upon Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), appellee moved to suppress the evidence seized from him.[3] Simply stated, his claim was that the search in question took place on a regularly scheduled bus which had traveled nonstop within the United States from Massena, New York, to the bus station in Malone, that the bus station could not be regarded as the "functional equivalent" of a border so as to validate the search as a "border search," and that his search and detention could not be otherwise justified. The United States District Court for the Northern District of New York, Edmund Port, Judge, granted appellee's motion to suppress. The Government appeals under 18 U.S.C. § 3731. We affirm.

■ The Government's powers to exclude aliens from the country, Chae Chan Ping v. United States, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889), and to collect duties, U.S.Const. art. 1, § 8, cl. 1, each carries with it the right to effectuate "border searches," under which individuals crossing international borders may have their persons, their luggage or effects, as well as the conveyances in which they cross, searched without warrant or probable cause.[4] The dual purpose of the search is to ascertain whether an illegal alien is seeking to cross the border or whether contraband or dutiable property is being smuggled. Congress has further legitimatized this power to search by giving

1. Border patrol agent Cowan, who detained Barbera, conceded that his initial questioning of the appellee was based simply upon the fact that he was in a public conveyance in Malone, N.Y. The bus in question had not been inspected in Massena, N.Y.

When appellee, who speaks only Italian, was asked about his citizenship, he offered no answer. Agent Cowan then gestured for him to leave the bus, and the appellee offered no resistance. Agent Cowan testified that

. . . I opened the door and I took him by the arm like I would anyone to direct him where I wanted him to go if they couldn't converse with me.

The agent testified that he did not consider Barbera to be under arrest at this time, but if he had tried to walk away he would have been detained.

2. The appellee was brought to a telephone where the agent called a priest who spoke Italian. The agent asked the priest to instruct the appellee to turn over to him his travel documents. After speaking to the priest, the appellee turned over his passport to the agent. The passport indicated to the agent that the appellee had no legal right to be in the country, and on this basis he was placed under arrest. He was also searched at this time, and a bus ticket was seized from him.

3. An alien within the United States has standing to assert a violation of constitutional rights even if his presence is illegal. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (Fifth Amendment); In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (Fourteenth Amendment). See Bolanos v. Kiley, 509 F.2d 1023 (2d Cir. 1975), slip op. 1523, 1526. See also Au Yi Lau v. INS, 144 U.S.App.D.C. 147, 445 F.2d 217, 223, cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971) (Fourth Amendment). The Government here does not suggest that appellee is not entitled to the same Fourth Amendment protection as are citizens.

4. See Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); United States v. 37 Photographs, 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). The right to conduct border searches was asserted in the first revenue act by the same Congress which passed the Bill of Rights. Act of July 31, 1789, 1 Stat. 29, 43. See 19 U.S.C. §§ 507, 1581, 1582. See also Almeida-Sanchez v. United States, 413 U.S. 266, 285, 288, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (White, J., dissenting).

to an officer of the Immigration and Naturalization Service (INS) "under regulations prescribed by the Attorney General . . . power without warrant" first to arrest any alien who in the officer's presence or view is entering or attempting to enter the country, 8 U.S.C. § 1357(a)(2),[5] and, second,

> within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . ..

8 U.S.C. § 1357(a)(3).

■ While the Attorney General's regulations could have carefully defined or substantially prescribed the border search powers, to date they merely provide for a redelegation of the powers to "[a]ny immigration officer," 8 C.F.R. § 287.1(c), under standards which defined the term "external boundary" to include the coastline up to the "three-mile limit," 8 C.F.R. § 287.1(a)(1), and defined "reasonable distance" to mean "100 air miles from any external boundary . . . or any shorter distance which may be fixed by the district director . . . .." 8 C.F.R. § 287.1(a)(2).[6] Relying on the 100-mile limit specified in the Attorney General's regulations, and without further standards or refinements spelled out in rules or regulations, the INS through its border patrol[7] conducted three types of surveillance along *inland* roadways— permanent checkpoints at certain nodal intersections, temporary checkpoints at various places, and "roving patrols." But Almeida-Sanchez v. United States, *supra,* held the third type unconstitutional, under the Fourth Amendment, in a case involving the warrantless search of an automobile, without probable cause to believe that the vehicle contained aliens or "even" had crossed the border. *Id.* 413 U.S. at 268, 93 S.Ct. 2535 (plurality opinion per Stewart, J.). Since *Almeida-Sanchez,* the Attorney General has not modified his border-search regulations and the INS has still not formally or legally promulgated any of its own.[8]

The plurality of the Court in *Almeida-Sanchez* said that searches may take place at not only the border but "at its functional equivalents"—examples of which were (1) "at an established station near the border," (2) "at a point marking the confluence of two or more roads that

---

5. The second clause of 8 U.S.C. § 1357(a)(2) permits an officer without warrant to arrest an alien anywhere in the United States if the officer

> . . . has reason to believe that the alien so arrested is in the United States in violation of any . . . law or regulation [concerning illegal aliens] and is likely to escape before a warrant can be obtained for his arrest . . . ..

8 U.S.C. § 1357(a)(4) extends the officer's power to arrest to cover *any* person reasonably believed to have violated a law relating to alien admission, exclusion or expulsion if there is a likelihood of escape; this merely restates the common law as to arrest for a felony.

6. An inartfully worded clause in the Attorney General's regulations, § 287.1(a)(2), gives a district director of the INS authority to fix a greater distance for purposes of boarding and searching aircraft. It is inartful because it ties his powers to § 287.1(b), the provisions of which require each district director to obtain approval of the Commissioner on the basis of unusual circumstances to go beyond the 100-mile limit (by implication even for aircraft searches).

7. The border patrol is part of the armed inspection organization within the Immigration and Naturalization Service, 8 C.F.R. § 100.4 (1974). Border patrol agents may apprehend illegal aliens since by regulation they have been authorized to do so by the Attorney General. 8 C.F.R. § 103.1(i); 8 U.S.C. § 1101(a)(18).

8. *But cf.* United States v. Baca, 368 F.Supp. 398 (S.D.Cal.1973) (containing discussion of the provisions in the INS "Border Patrol Handbook" detailing factors to be considered both in selecting sites for fixed checkpoints and in determining which cars should be stopped or searched. *Id.* at 406–07. This handbook is not available upon request to the INS so that even though it apparently contains a chapter dealing with inspection of common carriers it cannot assume the status of a rule or regulation under the Administrative Procedure Act, 5 U.S.C. § 552(a)(1) and (2).

extend from the border," and (3) "clearly," "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City . . . ." 413 U.S. at 272–73, 93 S.Ct. at 2539. It held, however, that a "roving patrol" search of a car "on a California road [State Highway 78] that lies at all points at least 20 miles north of the Mexican border," id., which road at no point reaches the Mexican border and at all points lies north of a major east-west interstate highway entirely within the United States, id. at 267–68, 93 S.Ct. 2535, 2539, was not at the "functional equivalent" of the border. Our case does not fit any of the three examples given by the Court to describe the functional equivalent of the border, and, while the search here was not as far removed from the border as the one in Almeida-Sanchez, that single fact is in no way conclusive.

 The search [9] here involved an interrogation of the passengers in a bus which had traversed New York State Highway 37 from Massena which is about three miles from the border to the depot in Malone. While the bus made no stops, Highway 37 meanders along the river for 11 miles where an international toll bridge connects it to Canada (Cornwall, Ontario, to Rooseveltown, New York), thence along the border (which runs through the St. Lawrence River) 12 miles to Fort Covington, a border station, thence travels south-southeast 14 miles to Malone. Malone itself, which is at least 10 miles from the Canadian bor-

der, is a confluence not only of Highway 37 but of Highway 11 (an east-west highway running essentially parallel to the border) and Highway 30 which runs generally north-south across the middle of the state from Canada to Pennsylvania. The Government argues, therefore, that Malone is the functional equivalent of the border because it is a point "marking the confluence of two or more roads that extend from the border." Routes 11 and 37 connect, however, only at assorted points to roads close to the border.[10] One searches the post-Almeida-Sanchez decisions in vain for any precedent which would bind us or even materially help us.[11] As Judge Port said below, after Almeida-Sanchez "The meaning of the functional equivalent of a Border search or the extended border still remains clouded." And as the Government brief concedes, or argues, "[i]f no sensible test [of what is the functional equivalent of the border] can be applied then the determination of whether an interior point is the functional equivalent of the border depends on the length of the Judge's foot" (Brief at 19). We hold that the search here was not at the Almeida-Sanchez plurality's "functional equivalent" since the existence of a sizeable city, Massena, and the nonstop travel of the bus therefrom, breaks the path from border to checkpoint. Although Malone does mark a confluence of Routes 30, 37 and 11, the fact that each of these roads either traverses the border or meets with other roads traversing the border before reaching Malone, makes it impossible for us to

---

9. Although the initial governmental intrusion here involved was only a request for identification, it was nevertheless a search and to the extent that the appellee was also detained it amounted to a seizure of the person as well. Cf. Terry v. Ohio, 392 U.S. 1, 34–35, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (White, J., concurring); Reich, Police Questioning of Law Abiding Citizens, 75 Yale L.J. 1161 (1966).

10. U.S. Route 11 at its eastern terminus, 45 miles from Malone, is very close to the border station on Interstate 87 at Rouse's Point. Route 37 between Massena and Malone connects to five roads going south or west away from the border and Route 11 connects to ten such roads between Rouse's Point and Malone.

11. E. g., United States v. Bowen, 500 F.2d 960, 962 (9th Cir.) (en banc), cert. granted 419 U.S. 824, 95 S.Ct. 40, 42 L.Ed.2d 47 (1974) (fixed checkpoint search on principal road from Mexicali to Los Angeles 49 highway miles from border unreasonable); United States v. Speed, 497 F.2d 546 (5th Cir. 1974) (on petition for rehearing, checkpoint search on U.S. Highway 281, 65-75 miles north of Mexican border unreasonable); United States v. Daly, 493 F.2d 395, 396 (5th Cir. 1974); United States v. King, 485 F.2d 353 (10th Cir. 1973). Cf. United States v. Bowman, 487 F.2d 1229 (10th Cir. 1973) (finding Almeida-Sanchez inapplicable to "routine inquiries" as to an individual's nationality).

regard this entire city as the functional equivalent of the border under *Almeida-Sanchez.*

■ But in justice to the Government our inquiry cannot stop here for the Government rather elaborately argues that *Almeida-Sanchez* really applies the rationale of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to border searches. After conceding that the type of search cannot be justified, as the plurality said, 413 U.S. at 269, 93 S.Ct. 2535, on the automobile "exception" to the warrant requirement, Chambers v. Moroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), or as an administrative search under Camara v. Municipal Court,

387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967),[12] the Government suggests (Brief at 9) that "[t]he test for determining whether a particular point is the functional equivalent of the border is therefore whether the same conditions which justify a detention at the border exist at the interior point." That is, at least in connection with a search for aliens as opposed to contraband,[13] the test should be whether there is "a continuing institutionalized reasonable" suspicion that any person or vehicle passing through the point in question may be transporting an alien not entitled to enter, and the need to make the intrusion at that point to prevent illegal border crossings.[14] But as we view this *Terry-*

**12.** *See also* United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), also held inapposite by the plurality in *Almeida-Sanchez,* 413 U.S. at 270–71, 93 S.Ct. 2535. The Government here does not rely on the concurring opinion of Mr. Justice Powell, *id.,* at 275 et seq., 93 S.Ct. 2535, which would permit roving patrol searches of automobiles if a general area warrant was secured. In that opinion Mr. Justice Powell rested his position on the grounds that only a small percentage of apprehended aliens are prosecuted; that the searches would be acceptable only if conducted where there is a high concentration of illegal aliens (Judge Port noted below that "Probably a random search of any bus in New York City would be as profitable on the average in uncovering illegal entrants to the United States as this bus was"); and that these searches are "incidental to the protection of the border." His approval of such searches emphasized that they are searches of automobiles, not persons or buildings (our case started as a search of the bus, but it ended as a search and seizure of the person). *See* 413 U.S. at 278–79, 93 S.Ct. 2535. This concurrence has received considerable comment, not all favorable. *See* Note, Area Search Warrants in Border Zones: Almeida-Sanchez and Camara, 84 Yale L.J. 355, 371 (1974) (hereinafter Yale Note). The problem is that there seems no rational limit to what searches can be ultimately justified on the basis of Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), once the reasoning of those cases is expanded beyond facts which involved detection of local building code viola-

tions. *See also,* LaFave, Administrative Searches and the Fourth Amendment: The Camara and See Cases, 1967 Sup.Ct.Rev. 1, 12–13. Our court has expressly declined to justify airport searches on *Camara-See* grounds, United States v. Albarado, 495 F.2d 799, 803–04 n. 9 (2d Cir. 1974), even though these can be styled "administrative" in the broader sense. *See* United States v. Davis, 482 F.2d 893 (9th Cir. 1973). Perhaps, however, all courts have difficulties stemming from what Professor Amsterdam has aptly termed the "atomistic view" of the Fourth Amendment, *i. e.,* the view of that important amendment as "a collection of protections of atomistic spheres of interest of individual citizens" rather than as a "regulatory canon requiring government to order its law enforcement procedures in a fashion that would keep us collectively secure in our persons, houses, papers and effects, against unreasonable searches and seizures." Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 367 (1974).

**13.** The distinction is drawn in Roa-Rodriquez v. United States, 410 F.2d 1206 (10th Cir. 1969). Whether the distinction is always a useful one is open to question, since a search for aliens can of course turn into a search for contraband if the investigating officer is alerted to suspicious circumstances. Since border patrol officers serve in a dual capacity both as customs and immigration inspectors, their roles cannot be easily compartmentalized. Yale Note at 366 n. 52.

**14.** The Government, of course, argues that the INS has a reasonable suspicion that *anyone* present in Malone, N.Y., "may have made an illegal entry," that the suspicion is related to the function of detecting (or preventing) illegal entries (as opposed, say, to a search in New

type argument, it is essentially the same (although possibly more limited in scope) [15] as that made by the dissent in *Almeida-Sanchez,* 413 U.S. at 285, 289, 93 S.Ct. 2535,[16] *viz.,* that a warrantless search of an automobile for the purpose of apprehending illegal aliens is per se reasonable, at least within a reasonable distance from the border which the dissent evidently considers to be 100 miles. *Id.* at 287–89, 93 S.Ct. 2535 and n. 4.[17] Even if we wanted to do so, as an inferi-

or court we cannot follow the dissents in the Court above.

We are, nevertheless, in an extremely nebulous area of the law, as one court put it, an area "characterized by extreme instability," United States v. Baca, 368 F.Supp. 398, 408 (S.D.Cal.1973), but one that has multiple and far-reaching consequences. The combination of Mr. Justice Powell's concurrence in *Almeida-Sanchez* and the implications from as well as the express language [18] of the

York City where it would detect only illegal residence), and that the intrusion is necessary because the alien has not had to pass "through some more significant point closer to the border" (Gov't Brief at 23). While we do not need to answer the Government contention on its own grounds, we do point out that appellee did have to pass through such a "more significant" point, *i. e.,* Massena.

**15.** Initially, the Government's brief argues only that this "*Terry*-type" approach be applied to make acceptable the questioning of a person as to nationality; however, the argument is then carried substantially further to allow more generalized searches (although the Government does concede that in any event a search for aliens would not allow the Government to search a suitcase).

**16.** The dissent, in addition to *Terry,* referred to United States v. Biswell, *supra;* Colonnade Catering Corp. v. United States, *supra;* Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); and *Camara, supra.* 413 U.S. at 289–90, 93 S.Ct. 2535. The dissent also relies on "[t]he judgment of Congress," saying that to disagree with that judgment is "to invalidate 8 U.S.C. § 1357 in the face of the contrary opinion of Congress that its legislation comported with the standard of reasonableness of the Fourth Amendment." *Id.* at 293, 93 S.Ct. at 2549. But with every respect to the author of the dissenting opinion, Congress did not say that all searches within 100 miles of the border were reasonable; it authorized the Attorney General to regulate searches by INS officers "within a reasonable distance from any external boundary." Section 1357(a)(3). The 100-mile figure was the Attorney General's, 8 C.F.R. § 287.1(a)(2). Enforcement of this regulation as such would, it can be argued, establish a 100-mile zone around the borders of the continental United States (including coastlines) or the perimeters of Alaska and Hawaii where the Fourth Amendment in its traditional sense would be nonexistent. *But see* 413 U.S. at 299 n. 11, 93 S.Ct. 2535. Congress may not have had this kind of "regulation" in mind.

**17.** It may be noted that the dissent did not limit this view by suggesting, as it might have,

that only evidence pertaining to the illegal entry of an alien uncovered in such a search would be admissible. This at least would narrow the possibilities of abuse. *See* United States v. Skipwith, 482 F.2d 1272, 1279 (5th Cir. 1973) (Simpson, J., concurring) and 1281 (Aldrich, J., dissenting) (airport search). Professor Amsterdam makes a cogent argument for limiting *Terry* or stop-and-frisk searches by such an expansion of the exclusionary rule, 58 Minn.L.Rev. at 437–38. In this regard an even stronger argument for limiting the admissibility of the fruits of such searches might be made with respect to "roving" border searches were one to adopt the *Almeida-Sanchez* dissent's view, since the indiscriminate nature of such searches is highly visible. As stated in Yale Note, *supra,* 84 Yale L.J. at 367 n. 53:

Some indication is provided by the Brief for Appellee at 25–26, Almeida-Sanches v. United States, 413 U.S. 266 [93 S.Ct. 2535, 37 L.Ed.2d 596] (1973). Nearly two million autos were stopped in 1972, and nearly 400,-000 searched thoroughly, to net 39,000 aliens. Thus, approximately 50 cars were stopped, and 10 searched thoroughly, for each alien found. Moreover, many aliens enter in groups, assisted by professional alien smugglers. *Id.* at 23. Because many of the aliens enter collectively one can only conclude that some multiple of 50 cars are stopped, and many times 10 are searched, for each alien-bearing *vehicle* found.

We recognize, of course, that the dual aspect of a border patrol agent's responsibilities would complicate this view, but conceptually there may be merit in an approach to the Fourth Amendment which focuses upon the purpose of a search and applies the exclusionary rule as to evidence not related to that purpose.

**18.** "I agree with Mr. Justice Powell that such a warrant so issued [*i. e.,* on "less than probable cause in the traditional sense"] would satisfy the Fourth Amendment, and I would expect such warrants would be readily issued." White, J., dissenting, 413 U.S. at 288, 93 S.Ct. at 2547. The INS Annual Report for 1973 at 16 pointedly takes note of this. *See* Yale Note

dissent would permit area warrants for vehicular searches by the INS under standards not delineated except that they would be "less than probable cause in the traditional sense."[19] These searches could take place within 100 air miles of the borders and seacoasts of the continental United States and the perimeters of Alaska and Hawaii. But one can suggest that in drafting the Fourth Amendment it was precisely such indiscriminate searches with which the Forefathers were primarily concerned, remembering that it was *general warrants* and *writs of assistance* which infuriated the Otises and Adams'. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 366 (1974) (hereinafter Amsterdam); T. Taylor, Two Studies in Constitutional Interpretation 41 (1969). *See also* United States v. Edwards, 415 U.S. 800, 804–05 n. 6, 94

at 356 n. 7. *See also* The Supreme Court, 1972 Term, 87 Harv.L.Rev. 1, 196 (1973).

Such warrants are apparently presently being issued by several district court judges in the Southern District of California. Their use and possible abuse are discussed in Leahy, Border Patrol Checkpoint Operation Under Warrants of Inspection: The Wake of Almeida-Sanchez v. United States, 5 Calif.West.Int. L.J. 62 (1974). One such warrant issued June 22, 1974, gave the border patrol the right to reopen its checkpoint at San Clemente, California, a checkpoint which had been closed as a result of United States v. Bowen, *supra.* A border patrol officer reported the following results:
1. The checkpoint was operated for a total of 124 hours and 10 minutes during which 145,960 vehicles passed through the checkpoint.
2. 802 vehicles were stopped at the checkpoint for questioning.
3. 202 vehicles were inspected.
4. Aliens were found in 171 vehicles.
5. 725 deportable aliens were apprehended in vehicles stopped at this checkpoint.
6. No property was seized.
Leahy, *supra,* at 68–69.

Since the issuance of the June 22, 1974, warrant—which was a general warrant which included the right "to conduct routine inspection of . . . vehicles"—similar warrants are being issued in the Southern District of California. But the new warrants limit the power of the border patrol to stop vehicles for routine inquiry concerning nationality. Any search of an automobile must be justified by independent evidence. *Id.* at 69.

S.Ct. 1234, 39 L.Ed.2d 771 (1974); United States v. Edwards, 498 F.2d 496, 498 n. 6 (majority opinion) and 503 (concurring opinion) (2d Cir. 1974). If general search warrants based on less than probable cause are to become the basis for official searches in such a wide area, it would not be too bold to suggest that we have come a little way from Entick v. Carrington, 19 Howell St. Tr. 1029, 1063 (1765) (overturning a "ridiculous warrant against the whole English nation").

What is at issue here is the balance to be struck between the Fourth Amendment's protection from unreasonable searches and seizures and the Government's conceded right to protect the integrity of its borders. The problem of illegal immigration is one of national concern. The adverse economic impact caused by illegal aliens is substantial and well documented.[20] But to respond to

Even accepting the validity of such limited warrants issued in connection with inspections at fixed checkpoints, it should be noted that they represent a substantial narrowing of the positions expressed by the concurrence and the dissent in *Almeida-Sanchez.*

**19.** In fairness, the concurring opinion of Mr. Justice Powell did suggest that before issuing such warrants judges could in some way consider proximity to the border, geography, likely number of aliens found and relative intrusiveness on innocent persons, with time limitations for roving searches on particular roads. 413 U.S. at 283–84, 93 S.Ct. 2535. *See also* The Supreme Court, 1972 Term, 87 Harv.L. Rev. 1, 201 n. 34 (1973). Absent Congressional or INS or Attorney General's regulations, however, the reasonableness of any warrant issued would be reviewable, if at all, only on a case to case basis.

**20.** Quite understandably, there are no precise statistics concerning the number of illegal aliens presently in residence within the United States, but the number is estimated at approximately one million. Department of Justice, Special Study Group on Illegal Immigrants from Mexico, A Program for Effective and Humane Action on Illegal Mexican Immigrants 6 (1973). A recent Congressional report concluded as follows:

Our experience leads us to conclude that these illegally employed aliens:
1. Take jobs which would normally be filled by American workers.
2. Depress the wages and impair the working conditions of American citizens.

this problem by watering down the probable cause requirements of the Fourth Amendment is most surely to take the lowest constitutional road. It would be dangerous precedent indeed for an economic problem, regardless of its magnitude, to provide the basis for the erosion of constitutional principles; much the more so when alternative solutions to the economic problem have been insufficiently explored by the other Branches of Government.[21]

Perhaps, therefore, it would be well to mention to the Government that a constitutional alternative presents itself—an alternative perhaps best set forth in Professor Amsterdam's extraordinary reflections, alluded to previously in this opinion. He proposes that we judges take a "regulatory view" of the Fourth Amendment, Amsterdam at 369, drawing a leaf from Professor Kenneth Culp Davis's notebook,[22] and that we shy away from the traditional all or nothing approach to that Amendment. *Id.* at 388. He would not adopt what he calls the *"Terry-*

*Schmerber* [Schmerber v. Cal., 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908] sliding scale approach" which may find its echo in the suggested area warrants which are to be issued on "less than probable cause," or in the Government's brief here;[23] a law enforcement officer he suggests, or a magistrate issuing a warrant we suggest, cannot all be Fourth Amendment scholars, and the law now is a "paragon of simplicity" compared to what it would be under a "graduated" Fourth Amendment. *Id.* at 392, 393–95. The positive alternative Professor Amsterdam suggests is that the discretion of police, here we translate to INS officers, be tolerably confined either by legislation or departmental (here Attorney General or INS) rules and regulations subject to judicial review for reasonableness. *Id.* at 410 et seq.

Repeating, "the objectionable feature of general warrants and writs is their indiscriminate character," in part because they are conducted at the discretion of executive officials who may act

---

3. Compete with unskilled and uneducated American citizens—the disadvantaged to whom our manpower programs are directed.

4. Increase the burden on American taxpayers through added welfare costs by taking jobs which may be filled by persons on welfare, thereby thwarting our efforts to find jobs for these welfare recipients through such programs as the work incentive program.

5. Reduce the effectiveness of employee organizations.

6. Constitute for employers a group highly susceptible for exploitation.

H.R.Rep.No.93–108 (Apr. 5, 1973). This report was filed in connection with H.R. 982, 93d Cong., 1st Sess. (1973), discussed in note 21, *infra.*

21. At present it is not a crime to employ illegal aliens in this country. H.R. 982, 93d Cong., 1st Sess. (1973), which would make it a crime knowingly to employ an illegal alien, was passed by the House of Representatives, but is now under consideration in the Senate Judiciary Committee. 119 Cong.Rec.S. 8309 (daily ed. May 7, 1973). Such a criminal statute might do a lot toward solving the problems created by the entry of illegal aliens, by making the country less attractive to enter.

22. K. Davis, Discretionary Justice 94–95 (1969). *Cf.* Wright, Beyond Discretionary Jus-

tice, 81 Yale L.J. 575, 578–82 (1972). *See also* Note, Procedural Due Process in the Context of Informal Administrative Action: The Requirements for Notice, Hearing and Prospective Standards Relating to Police Selective Enforcement Practice, 53 B.U.L.Rev. 1038 (1973); K. Davis, Administrative Law § 1.04–13 (1970 Supp.). Professor Davis gives Judge Friendly due credit for his The Federal Administrative Agencies (1962), which develops this theme as to non-police agencies.

23. Obviously, there is a higher probability that an illegal entrant will be detected at or near the border than will be the case 100 miles from the border, but more importantly there is more reason to suspect that an individual encountered at or near the border is an alien and more reason to suspect that an alien encountered at or near the border may be an illegal entrant or be attempting an illegal entry, than is the case the farther one is removed from the border. Indeed, there is a reasonable suspicion that anyone crossing the border may be an alien attempting an illegal entry, but once past the border that suspicion diminishes in correlation to the distance from the border, until a point is reached where the suspicion is no longer reasonable.

Gov't Brief at 10.

despotically or capriciously, *i. e.,* arbitrarily. *Id.* at 411.[24] Therefore, unless the search is conducted within either reasonable legislative or departmental rules, Professor Amsterdam argues, it should be invalid. *Id.* at 416.[25] Rule-making, which could so readily be done here and indeed was so clearly in congressional contemplation in enacting § 1357 (and indeed which may be informally in effect, note 8 *supra*), would, Professor Amsterdam continues (and we concur), (1) enhance the quality of INS decisions (a) by focusing attention on the fact that *policy* is being made, (b) by putting the authority in responsible and capable hands,[26] and (c) by promoting efficiency; (2) would tend to insure fair and equal treatment of citizens (a) by reducing the influence of bias, (b) by providing uniform standards, and (c) by guiding police behavior; (3) would increase the visibility of the decisions;[27] and (4) offers the best hope for consistent obedience to and enforcement of the constitutional norms that guarantee the citizen's liberty. *Id.* at 423–29. As

Chief Judge Bazelon has urged, in another connection, to be sure,

> judicial review alone can correct only the most egregious abuses. . . . When administrators provide a framework for principled decision-making, the result will be to diminish the importance of judicial review by enhancing the integrity of the administrative process, and to improve the quality of judicial review in those cases where judicial review is sought. *Environmental Defense Fund v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (1971).

The alternative of administrative rule-making is open to the new Attorney General and to the INS. Is it not the beginning of a way out of the "extremely unstable" area of the law in which we find ourselves? Only the Supreme Court can answer these questions and perhaps it will answer them in border search cases or show some other way out of the labyrinth of *Almeida-Sanchez* in several cases it now has before it.[28] Until then

24. *See* K. Davis, Discretionary Justice at 88, 222; Wright, Beyond Discretionary Justice, 81 Yale L.J. at 589.

25. A paramount purpose of the fourth amendment is to prohibit arbitrary searches and seizures as well as unjustified searches and seizures. The warrant requirement was *the framers' chosen instrument* to achieve both purposes, and it should continue to be applied to those ends, as the Supreme Court's present fourth amendment doctrines apply it, so far as it can practicably go. However, the warrant requirement obviously fails to assure against arbitrariness in kinds of searches and seizures that are permitted without warrants, or where police discretion controls the decision to apply for a warrant. The emergence of modern professional police forces and our knowledge of the vast discretion that they exercise demonstrate both the need and the capability to provide an effective safeguard against arbitrariness in these kinds of searches and seizures; and the manifestly serviceable instrument to do it is what Kenneth Culp Davis calls "one of the greatest inventions of modern government," unavailable to the framers but perfectly commonplace today: administrative rulemaking. Arbitrary searches and seizures are "unreasonable" searches and seizures; ruleless searches and seizures practiced at the varying and unguided discretion

of thousands of individual peace officers are arbitrary searches and seizures; therefore, ruleless searches and seizures are "unreasonable" searches and seizures.

For me, an additional and forceful legal argument in favor of the rulemaking requirement is the way in which it cuts through so many of the problems of fourth amendment doctrine-building. The doctrinal basis of the requirement itself is solid . . . .
58 Minn.L.Rev. at 417 (footnotes omitted).

26. There is a suggestion of this in Mr. Justice White's dissent, 413 U.S. at 291–93, 93 S.Ct. 2535.

27. *See* McGowan, Rule-Making and the Police, 70 Mich.L.Rev. 659, 681 (1972). Here a reviewing court would have to bear in mind that surprise may well be a necessary element in border searches, so that standards of flexibility may have to be built in the regulations.

28. The retroactive application of *Almeida-Sanchez* is presently before the Court in United States v. Peltier, 500 F.2d 985 (9th Cir. 1974), cert. granted, 419 U.S. 993, 95 S.Ct. 302, 42 L.Ed.2d 265 (1974) (No. 73–2000); United States v. Bowen, *supra,* and United States v. Ortiz (9th Cir. June 19, 1974), cert. granted, 419 U.S. 824, 95 S.Ct. 40, 42 L.Ed.2d 47 (1974) (No. 73–2050). Perhaps more directly in point is United States v. Brignoni-Ponce,

we can merely suggest a step toward solution of the important, basic issue this case presents. For reasons previously stated, the judgment is affirmed.

Judgment affirmed.

499 F.2d 1109 (9th Cir. 1974), cert. granted, 419 U.S. 824, 95 S.Ct. 40, 42 L.Ed.2d 48 (1974), which focuses directly on the inter-rogative power of the border patrol and is in conflict with United States v. Bowman, *supra.*