**UNITED STATES of America,
Appellee,**

v.

**Enid SALTER a/k/a Aaron
Salter, Appellant.**

**No. 1253, Docket 75–1135.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1975.

Decided Aug. 15, 1975.

John H. Napier, Buffalo, N. Y., for appellant.

Theodore J. Burns, Asst. U. S. Atty., Buffalo, N. Y. (Richard J. Arcara, U. S. Atty., for the Western District of New York, Buffalo, N. Y., of counsel), for appellee.

Before MOORE, FRIENDLY and VAN GRAAFEILAND, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal from a conviction, after trial before Chief Judge Curtin and a jury in the United States District Court for the Western District of New York, on two counts of an indictment which charged appellant with unlawfully encouraging the entry of two Jamaican women not lawfully entitled to enter or reside within the United States, in violation of 8 U.S.C. § 1324(a)(4).[1] Although several points are raised, only one merits discussion.

One of the women, Shirley Paul, testified that while in Canada she had given $600 to an unknown man to transmit to Salter, who later acknowledged its receipt, for his assistance in bringing her into the United States. The other, Myrtle Hurst, testified that while in Canada she had given Salter $250 in Canadian currency for the same purpose. The women turned up at Salter's home in Buffalo, New York, on the afternoon of Sunday, July 29, 1973, although there is some confusion over the details as to just how they got there.[2] It is undisputed that their entry into the United States was illegal.

Around 9:00 P.M. Salter escorted the two women to the Greyhound Bus Terminal where they purchased one-way tickets to New York City. Border Patrol Agents Fernan and Chandler had conducted what they termed a routine "immigration check" of persons boarding the bus.[3] After the agents thought that all passengers had been checked, they saw the two women, still escorted by Salter, about to enter the bus. The agents returned and, after showing their credentials, asked Salter and the women to state their citizenship and where they were born. All answered "Buffalo" but the women did this "with a heavy accent" sounding, Agent Fernan testified, like "Boofalo."[4] Agent Fernan thereupon asked Salter to come into the baggage room, while Agent Chandler took the two women across the terminal to the agents' car. After giving Salter "a quick frisk," Agent Fernan asked for identification. Salter pulled a thick wallet from his pocket and opened it to get out a driver's license. The agent observed a large quantity of currency, some of it red and apparently Canadian—an observation confirmed when at Agent Fernan's request Salter counted the money.[5] Shortly after this, Agent Chandler entered the baggage room and announced "Well, the girls broke. He did bring them in. They stated it."[6] Salter was then placed under arrest.

1. The jury was unable to agree on two other counts charging Salter with unlawfully bringing the women into the United States in violation of 8 U.S.C. § 1324(a)(1).

2. This confusion doubtless accounts for the jury's disagreement on the counts for unlawful transportation.

3. According to Agent Fernan this consisted of asking all passengers to identify themselves, to state their citizenship and, if they were aliens, to show what identification they had.

4. This was the testimony at trial. At the suppression hearing Agent Fernan spoke in terms of a "Jamaican accent" or a "high English accent" which he had heard before, presumably from persons born in Jamaica.

5. The court refused to allow testimony as to the amount revealed—$900, including some $500 in Canadian bills.

6. The judge instructed the jury not to take into account what the agent said the women said.

■ The defendant does not assert that the routine interrogation by Border Patrol Agents of passengers boarding a bus in Buffalo bound for New York City was invalid, and we accordingly express no opinion on that point.[7] His argument is rather that the testimony as to the contents of the wallet should have been excluded as being the fruit of unlawful conduct by the agents after that initial contact. We find nothing unlawful. To a trained border patrol agent at Buffalo, only two miles from the nearest bridge from Canada, the assertions of two women with "heavy accents" that they had been born in "Boofalo" was enough to warrant further investigation, although not to justify an arrest. In contrast to the situation in California and many other states where the number of Mexicans who have been legally admitted or have become American citizens renders Mexican accent or appearance insufficient as an indicator of illegal entry, see *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Mallides,* 473 F.2d 859 (9 Cir. 1973), the agents could rely on their experience that few people born in Buffalo have a Jamaican accent. *United States v. Brignoni-Ponce, supra,* 422 U.S. at 884–87, 95 S.Ct. 2585. Although Salter did not have a foreign accent, his close involvement in helping the women get on the bus, combined with his silence when they said they were born in "Boofalo," was sufficient to raise a reasonable suspicion that he was a participant in violating the law. That suspicion serves to authorize a brief interrogation, as the Supreme Court held in *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972):

A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*United States v. Brignoni-Ponce, supra,* 422 U.S. at 881–83, 95 S.Ct. 2574, has now settled that such an investigation, based on reasonable suspicion, may be used to enforce the immigration laws.[8] We likewise see nothing wrong in Agent Fernan's asking Salter to step into the baggage room, a place more convenient for interrogation than an

---

7. The recent Supreme Court decisions in *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) and *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), provide no firm resolution as to the validity of checkpoint stops made for the purpose of routinely inquiring into citizenship status, where no search is made. *Compare* the comments of Justice Rehnquist, concurring in *Ortiz,* 422 U.S. at 898, 95 S.Ct. 2585, *with* the comments of Justices White and Blackmun, concurring in *Brignoni-Ponce,* 422 U.S. at 914, 95 S.Ct. 2574. In addition to possible considerations of waiver, we would not want to resolve this troublesome issue in a case where there was an inadequate record below, and the point was not briefed by either side on appeal.

The question might stand differently if *United States v. Barbera,* 514 F.2d 294 (2 Cir. 1975) were conclusive on the issue here presented, but it is not. In *Barbera* this court affirmed the suppression of evidence taken from the defendant as a result of a citizenship interrogation in a bus depot in Malone, New York. The reasoning of the case, however, depended on the characterization of that encounter as a "search" carried out by a "roving patrol" while not at a "functional equivalent" of the border, and thus impermissible under *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Given the paucity of the record below, and in light of the Supreme Court decisions subsequent to *Barbera,* we do not think that the record here requires us to characterize the interrogation of the two women in a similar manner.

8. The American Law Institute's Model Code of Pre-Arraignment Procedure § 110.2(1)(a) (Proposed Official Draft, April 15, 1975) would limit the stop authority to cases where there is a reasonable suspicion of the past or imminent commission of a crime "involving danger of forcible injury to persons or of appropriation of or damage to property." This was implicitly rejected as a constitutional limitation in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), since, although it had been reported that Williams was carrying a gun, this itself was not a crime under Connecticut law, Conn.Gen.Stat. §§ 29–35, 29–38. The suspected crime was the possession of narcotics.

open platform; in any event this had no causal relation to what transpired.

The remaining question, if there be one, is whether the agent had the right to demand identification rather than simply asking for Salter's name and address. Once a lawful stop for investigative purposes is under way, it is mere routine for an officer to ask for identification, see *United States v. Lincoln,* 494 F.2d 833, 838 (9 Cir. 1974). *Adams v. Williams,* in the language just quoted, appears to sanction this. We have previously done so, *United States v. Santana,* 485 F.2d 365, 368 (2 Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), as have other courts, *Dell v. Louisiana,* 468 F.2d 324, 326 (5 Cir. 1972), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1904, *cert. denied,* 411 U.S. 938, 93 S.Ct. 1904, 36 L.Ed.2d 400 (1973). Such a request is relatively non-intrusive, and there are important reasons why an officer needs to obtain a correct identification. In this case, Agent Fernan might have wished to telephone Border Patrol Headquarters to see whether Salter had a record of smuggling aliens from Canada. To imagine an even simpler case, an officer may need to know a person's identity so as to be able to contact him at a later date. See ALI, Model Code of Pre-Arraignment Procedure, Commentary, 270 (Proposed Official Draft April 15, 1975). Naturally, there is a possibility of harassment in even routine requests for identification, but there are too many legitimate uses not to allow it once an otherwise lawful stop has taken place. LaFave, *"Street Encounters" and the Constitution:* Terry, Sibron, Peters, *and Beyond,* 67 Mich.L.Rev. 39, 61–62 (1968).

When Salter responded to this request for identification by exposing his wallet, the large amounts of currency came into plain view and were lawful evidence. *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); cf. *United States v. Riggs,* 474 F.2d 699, 704 (2 Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). We need not debate whether the plain view exception also covers the slightly more detailed testimony of what Agent Fernan observed after Salter counted the money. If it did not, which we do not decide, any additional impact of this testimony was so minimal that the doctrine of harmless error would apply.

Affirmed.