**UNITED STATES of America**

v.

**Vincent Anthony MAGDA, Defendant.**

**No. 75 Cr. 942.**

United States District Court,
S. D. New York.

March 9, 1976.

Thomas J. Cahill, U. S. Atty., S. D. N. Y., New York City, Jeremy G. Epstein, Asst. U. S. Atty., New York City, for plaintiff.

William J. Gallagher, Federal Defender Services Unit, The Legal Aid Society, New York City, John P. Curley, New York City, of counsel, for defendant.

ROBERT L. CARTER, District Judge.

## OPINION

On the afternoon of September 5, 1975, New York City Patrolman Saverio Alesi arrested the defendant, Vincent Anthony Magda, for possession of a marijuana cigarette. At the time of his arrest Magda also had on his person an unloaded 9mm. Browning automatic revolver and a "demand note," the text of which is set out in the margin.[1] Handwriting analysis of the note linked Magda to the robbery of the United Mutual Savings Bank, 20 Union Square, New York City, for which he was indicted on September 25, 1975 (75 Cr. 942),[2] and apparently pointed to his involvement in bank robberies in Chicago, Washington, Miami and New Orleans. Subsequently, additional evidence was uncovered by the Federal Bureau of Investigation that might provide additional links to defendant's involvement in the New York bank robbery.

Defendant moves to suppress the demand note, statements made by him after his arrest, and any other fruits of the search in which the note was found. If evidence of the crime was improperly obtained, it cannot be used against the defendant at trial. *Weeks v. United States*, 232 U.S. 383, 393, 34 S.Ct. 341, 344, 58 L.Ed. 652, 655 (1914). The government concedes that before the demand note was found, Magda had not been suspected of committing any of the crimes with which he is now charged and that if the search was unlawful, all the evidence against Magda is tainted and cannot be used against the defendant. This seems to be true of the evidence in respect of the various other bank robberies as well, but obviously that is beyond the scope of my inquiry. *See generally, Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

A hearing was held on defendant's suppression motion on November 26, 1975. Alesi and the defendant testified. On December 15, 1975, the hearing was reopened at the defendant's request. At the later hearing, the defendant's mother, Mrs. Margaret Magda, two of his sisters, Mrs. Virginia Lees and Mrs. Patricia Dunbar, testified and the police officer was recalled for additional testimony. The hearings produced sharply differing accounts of some details of the arrest. I believe Alesi's version of the events more exactly accords with what took place. However, even accepting the po-

1. "THIS IS A ROBBERY. KEEP YOUR HANDS WHERE I CAN SEE THEM AT ALL TIMES. THERE IS TWO OF US SO DO AS YOU ARE TOLD AND NO ONE GETS HURT. PUT ALL YOUR 50's AND 100's INTO THE ENVELOPE AND HAND IT BACK."

2. Magda was charged in two counts with violating Title 18, U.S.C. §§ 2113(a) and (d) by robbing a federally insured bank by force, violence and intimidation and by committing assault during that robbery.

lice officer's testimony as the basis for my determination, I am compelled to conclude that the motion to suppress must be granted.

### Background Facts

On September 5, 1975, Alesi, an eleven-year veteran of the New York City Police Department, was on foot patrol on Eighth Avenue between 42nd and 45th Streets. He described the area as a "narcotics prone location." When Alesi first noticed Magda, the defendant was on the north side of 43rd Street, about fifteen to twenty feet from the northwest corner and approximately thirty to thirty-five feet away from Alesi who was standing on the southwest corner of Eighth Avenue and 43rd Street. Alesi testified that the defendant, who is white, was speaking to a "young," "male black" with whom he exchanged something. Each man gave and received something simultaneously, but Alesi could not see what changed hands. After the exchange, the black man looked up in Alesi's direction, turned around in a "rapid motion" and proceeded to walk westbound down 43rd Street away from Alesi in the direction of Ninth Avenue. Magda then turned toward Alesi, crossed 43rd Street at an angle heading down Eighth Avenue toward 42nd Street and passed the officer. As Magda walked past, Alesi tapped the defendant on the shoulder and asked him to stop. Magda turned to face Alesi and slowed his pace but continued down Eighth Avenue, walking backwards. Alesi walked with him for several steps covering perhaps ten feet before they both stopped.

Alesi asked the defendant what had transpired between him and the black man. Magda at first said nothing had happened; but when asked again, he replied, "All right. I bought a marijuana cigarette for a dollar," and produced the cigarette from his inside coat pocket. Alesi then placed the defendant under arrest and walked him back up to 43rd Street in a vain attempt to find the other man. Alesi searched the defendant, discovered the gun and the note, and took him to the police station where he was booked and locked up.

Although Alesi has been on the police force for eleven years, at the time of this incident, he had been on foot patrol in the midtown area for approximately six months. He had observed two street arrests for narcotics by other police officers on that street and he himself had previously made street arrests for narcotics, but not in that area. When asked to describe the extent of his knowledge of narcotics activities in the area, Alesi referred to maps and graphs in the muster room at the Midtown South Precinct, but expressed no additional personal experience. Alesi also explained that McCaffrey Park is a center of much of the drug traffic in the Forty-Third Street area. The park is roughly in the middle of the block between Eighth and Ninth Avenues—100 to 125 feet from where the exchange between the defendant and the black man took place.

When asked by the court what it was about the transaction between Magda and the black man that caused him to stop the defendant, Alesi answered: "At the location. And when the male black exchanged something and he seen me, he turned in a rapid motion and proceeded westbound . . . on 43rd Street." (Transcript at 41.) Apparently Alesi had never seen the black man or the defendant before and possessed no independent knowledge that either might be involved in drug trafficking.

The government offered Alesi's notes, written some time shortly after the arrest was made. These notes describe the incident in the same way Alesi spoke of it on the stand, although in more conclusory language: "observed one male white making buy from one male black at 43rd Street and Eighth Avenue, stopped male white, admitted he bought one marijuana cigarette for a dollar." [3]

---

**3.** Defendant Magda's account of the events is different from that of the officer in some respects. Magda testified that the marijuana

cigarette had been in his pocket from earlier in the day; that he had given change to the black man; that he did not produce the cigarette or

*Proceedings in State Court*

On November 14, 1975, a suppression hearing was held in Criminal Court of the City of New York before Judge Alfred H. Kleiman. The account of the arrest that Alesi gave in that hearing was substantially the same as his testimony here. The only possibly significant differences are that in state court Alesi did not mention touching Magda's arm as the defendant walked past him, and the defendant did not testify.

After oral argument and a review of two New York State cases (*People v. Rosemond,* 26 N.Y.2d 101, 308 N.Y.S.2d 836, 257 N.E.2d 23 (1970), and *People v. Cantor,* 36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975)), Judge Kleiman ruled from the bench that the *Cantor* case requires that before a patrolman can stop a person in a public place, the officer must have a reasonable suspicion not just "any suspicion, no matter what the basis of that suspicion may be" that criminal activity has happened, is happening, or is about to happen. (State Transcript at 33.) Judge Kleiman concluded that:

> "To deny the motion of the Defendant in this particular case would mean the mere denomination of a particular area as a high narcotics area . . . would mean that an Officer, upon the mere exchanging of hands, can stop anyone walking down 43rd Street and Eighth Avenue. I do not believe that is sufficient articulation for the basis of the right to stop a citizen."

(State Transcript at 34.)

Judge Kleiman thereupon granted the defendant's motion to suppress.

*Discussion*

Defendant contends that the officer acted improperly in stopping him as he walked down Eighth Avenue. Since I accept Alesi's version of the incident, specifically that after he questioned Magda the defendant voluntarily produced the marijuana cigarette, it follows that if the stop was valid, Magda was lawfully arrested after he had produced the cigarette. Possession of the cigarette is classified as a Class A Misdemeanor under New York law. Penal Law § 220.03. A police officer may arrest without warrant if he has probable cause to believe a crime has been committed. *United States v. Watson,* 44 U.S.L.W. 4112, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (Jan. 26, 1976); *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543, 552 (1925). New York specifically authorizes its law enforcement personnel to make such warrantless arrests, New York Criminal Procedure Law § 140.10, and once Alesi had placed Magda under arrest, there is no question that the officer could search the defendant's person. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ Neither the government nor the defendant suggests, however, that Alesi's first contact with the defendant constituted an arrest necessitating probable cause justification. *See Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4

---

show it to Alesi; that he stopped when Alesi grabbed him by the shoulder and asked him about a package; that after he stopped Alesi pushed him back up to 43rd Street and then searched him. During the search the officer discovered the gun and the marijuana cigarette, and according to the defendant, Alesi did not find the demand note until a later search at the police station.

Magda's sisters and his mother testified that they had each telephoned the stationhouse the night of Magda's arrest and had spoken to Alesi. Each spoke to Alesi early in the evening and at those times he mentioned to each of them searching Magda and finding the mari-

juana cigarette and the gun. Alesi did not say that Magda had voluntarily pulled out the cigarette. Each testified that the officer made no reference to a note on the first call. The two sisters testified that they called back later and then learned that the demand note had been found.

Alesi acknowledged receiving two or three calls from relatives of the defendant on the night of September 5, 1975. He did not remember five calls from them, and, in respect of those he remembered, he denied saying anything in a subsequent phone call at variance with the earlier one.

L.Ed.2d 134 (1959).[4] Indeed, the spectrum of authorized police street procedures may encompass some kind of inquiry that does not even rise to the level of a stop and is therefore not a "seizure" within the protection of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904 (1968). But in this case it is clear that Alesi's first physical contact with Magda as the latter was walking along a public street at the very least constituted an investigatory stop. *See Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra; Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

> "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio, supra*, 392 U.S. at 16, 88 S.Ct. at 1877, 20 L.Ed.2d at 903.

The government acknowledges this, but maintains that the stop was reasonable.

 Since the stop was made by a municipal police officer purportedly acting under state and local authority, I am required, I believe, to measure the validity of the stop by state law bench marks.[5] Even though New York law governs, Judge Kleiman's holding that the evidence is inadmissible does not control decision here. The prosecuting party is the federal government, not the State of New York. The United States was not a party to the state court proceeding and cannot be bound by what was decided there.[6] Judge Kleiman's decision, however, was based on substantially the same facts as those presented here and is now part of the body of New York law that must be considered, but I am required to make an independent determination as to whether the stop is consistent with the requirements of New York law.

The Court of Appeals of New York has recently held:

> "In New York the authority to intercept persons on the street is derived from two sources, the stop-and-frisk law (CPL 140.50) and the common-law power to inquire. Although the former is more narrowly circumscribed than the latter, because it entails a greater intrusion on the privacy of the individual, neither may be exercised in derogation of the State and Federal Constitutions.

> "Before a person may be stopped in a public place a police officer must have reasonable suspicion that such person is committing, has committed, or is about to commit a crime (CPL 140.50). Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. (Compare Schwartz, Stop and Frisk: A Case Study in Judicial Control of the Police, 58 J.Crim.L.C. & P.S. 433, 445, with La Fave, 'Street Encounters'

---

**4.** In addition, no issue is raised that at the time Magda voluntarily produced the cigarette he was "in custody" and should have been given a *Miranda* warning. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** *United States v. Lovenguth*, 514 F.2d 96, 98 (9th Cir. 1975); *United States v. Walling*, 486 F.2d 229, 235 (9th Cir. 1973) *cert. denied* 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974); *United States v. Lepinski*, 460 F.2d 234, 237 (10th Cir. 1972); *but see United States v. Richards*, 500 F.2d 1025 (9th Cir. 1974) *cert. denied* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975). *See, Call v. United States*, 417 F.2d 462, 464–65 (9th Cir. 1969); *United States v. Thomas*, 396 F.2d 310, 313 (2d Cir. 1968). *See*

*also, Ker v. California*, 374 U.S. 23, 37, 83 S.Ct. 1623, 1631, 10 L.Ed.2d 726, 740 (1963); *Taylor v. State of Arizona*, 471 F.2d 848, 850–51 (9th Cir. 1972) *cert. denied* 409 U.S. 1130, 93 S.Ct. 948, 35 L.Ed.2d 262 (1973); *Richardson v. State of Maryland*, 398 F.Supp. 425, 432 (D.Md.1975); *United States v. Rickus*, 351 F.Supp. 1379, 1381 (E.D.Pa.1972), *aff'd*, 480 F.2d 919 (3d Cir.), *cert. denied*, 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973).

**6.** *United States v. Smith*, 446 F.2d 200, 202 (4th Cir. 1971); *United States v. Feinberg*, 383 F.2d 60, 71 (2d Cir. 1967); *see, Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475 (1970); *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262 (1975). Civil No. 75–2094 (2d Cir. Dec. 29, 1975).

and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich.L.Rev. 40, 70.) To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice (*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, *supra; Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441). Nor will good faith on the part of the police be enough to validate an illegal interference with an individual (e. g., *Terry v. Ohio, supra; Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, *supra; Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484; *Smith v. County of Nassau*, 34 N.Y.2d 18, 355 N.Y.S.2d 349, 311 N.E.2d 489)." *People v. Cantor, supra*, 36 N.Y.2d at 112–13, 365 N.Y.S.2d at 516, 324 N.E.2d at 877.

In *People v. Cantor, supra*, the Court of Appeals ruled that an observation of the defendant and a companion smoking marijuana cigarettes "from a nearby rooftop . . . through the kitchen window" (36 N.Y.2d at 109, 365 N.Y.S.2d at 513, 324 N.E.2d at 875) could not be considered sufficient objective information that would amount to the specific articulable facts needed to stop someone under Criminal Procedure Law § 140.50. Moreover, the observation could not give rise to a "founded suspicion that criminal activity is afoot" (36 N.Y.2d at 114, 365 N.Y.S.2d at 517, 324 N.E.2d at 878) to validate a detentive stop under a policeman's common law power. On the other hand, in *People v. Kreichman*, 37 N.Y.2d 693, 376 N.Y.S.2d 497, 339 N.E.2d 182 (1975) a policeman's observation of a person smoking a marijuana cigarette did provide reasonable cause to stop the defendant's automobile. The police car had pulled up on the passenger side of defendant's Cadillac. Both officers observed the passenger smoking what they

concluded was a marijuana cigarette. Both the defendant and his passenger seemed to be looking about nervously. The Court of Appeals decided that the officers' close-up observation of the passenger would allow a reasonable belief that he held a marijuana cigarette in his hand.[7]

The stop of Magda, however, was not based on a reasonable or founded suspicion as that term has been developed in New York's decisional law. Alesi was relatively inexperienced in the field of narcotics street transactions. His eleven years on the force had been spent first as a foot patrolman in Brooklyn for three years, followed by almost eight years as a motorcycle policeman. In his six months on patrol in midtown, Alesi had made no street arrest for narcotics in that area although he had observed two such arrests. Special expertise might have allowed the officer more reasonably to suspect criminal activity from what could have been an innocent, or, at best, ambiguous scene that he observed, *see United States v. Salter*, 521 F.2d 1326, 1328 (2d Cir. 1975), but there is nothing in this record to warrant holding that Alesi possessed any such extraordinary skill.

He had seen neither Magda nor the unknown black man before, and had no information from a reliable informer that would support a suspicion that either man was involved in drug sales or other criminal activity. When Alesi first saw the defendant and the black man they were in the process of exchanging something. He had not observed them when they first met at that location. For all he knew they could have been previously acquainted. At the time he observed them the two men could have been terminating a long conversation with an exchange of addresses; they could merely have bumped into each other accidentally in taking leave of one another. There are a vast variety of situations and circumstances that could

---

**7.** For other recent cases in which reasonable suspicion or founded suspicion has been found lacking, *see People v. Bergers*, App.Div., 377 N.Y.S.2d 67 (1975); *People v. Towers*, App. Div., 373 N.Y.S.2d 593 (1975); *People v. Grant*, 379 N.Y.S.2d 221 (Supreme Court, 1975).

explain as being innocent and innocuous the apparent exchange the officer observed. Alesi did not describe the exchange as furtive or say that either party made an attempt to conceal the substance that was changing hands. He testified that the black man had looked up in his direction, and then turned in a rapid motion and walked away. It is difficult to view these actions as furtive and therefore capable of supporting a reasonable suspicion. Alesi never suggested that the black man ran or even walked quickly as he proceeded west on 43rd Street. In addition, the defendant turned towards the officer and walked past him—hardly suggestive of criminal involvement. This exchange is susceptible of too many varied interpretations to justify Alesi's suspicion that criminal activity had occurred.

■ The reason for the stop was primarily because of an observed exchange, albeit unknown, between a young black man and a young white man in an area of the city defined as "narcotics prone."[8] There is nothing in the record to show that it is more likely than not that narcotics dealing can be reasonably expected to generate this kind of encounter between a young white and a young black person than between two men of the same race, between two women, or between any two human beings of any different ethnic origin or class. Since apparently Alesi's sole justification for stopping the defendant and interrogating him was based on Magda having had some contact with a young black man, the specific articulable facts necessary to justify police interference with an individual on the public streets were lacking. More substantial information connecting a person with criminal activity is needed under New York law. A brief stop for questioning is surely not the greatest indignity a person can suffer, *see United*

*States v. Riggs,* 474 F.2d 699, 703 (2d Cir.) *cert. denied* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); but it is a seizure of the person and should not be initiated by a law enforcement officer because of a vague hunch or notion, unsupported by articulable facts, that criminal activity is happening, has happened or is about to happen.

It may be noted parenthetically at least that were I to apply federal standards I would reach the same result. The standards voiced by the New York Court of Appeals in *People v. Cantor, supra,* are not inconsistent with federal cases interpreting the constraints imposed by the Fourth and Fourteenth Amendments on police action. In *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906, the Supreme Court held that "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Footnote omitted.) In that case the "stop" and the "frisk" occurred together since the officer took hold of the suspect and immediately patted down his clothes. (392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.) This case, unlike *Terry* involves only a stop and no frisk. A greater quantum of information is needed to justify a frisk—a limited search for weapons—than for a stop alone. Nevertheless, the guidance of the Supreme Court is now clear, and is essentially the same as that of the New York Court of Appeals, that a mere hunch supported by no real basis in fact cannot support an investigative stop. *United States v. Brignoni-Ponce,* 422 U.S. 873, 880–81, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams, supra; Sibron v. New York, supra.* Recent cases of this circuit are not to the contrary. *United States v.*

**8.** In a proper case area reputation may be a factor to weigh to determine the reasonableness of a policeman's suspicions. Such a generalized notion must be used with care, *see generally, United States v. Gonzalez,* 362

F.Supp. 415, 421–22 (S.D.N.Y.1973); *People v. Brown,* 24 N.Y.2d 421, 301 N.Y.S.2d 18, 248 N.E.2d 867 (1969), and cannot be the lynch pin supporting an otherwise extremely frail hunch.

*Salter, supra; United States v. Santana,* 485 F.2d 365 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974).

Accordingly, the motion to suppress is granted, and it is so ordered.