**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bisram SUGRIM, Defendant-Appellant.**

**No. 648, Docket 83–1324.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 13, 1984.

Decided April 2, 1984.

Sonia C. Jaipaul, Asst. U.S. Atty., Buffalo, N.Y. (Salvatore R. Martoche, U.S. Atty. W.D.N.Y., Buffalo, N.Y., of counsel), for plaintiff-appellee.

Patrick J. Brown, Buffalo, N.Y. (LoTempio & Brown, Buffalo, N.Y., of counsel), for defendant-appellant.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

On this appeal we review the constitutionality of a brief detention of a suspected illegal alien. These detentions are, the government contends, necessary to stem the flood of illegal aliens into the United States. More than a million such persons were apprehended trying to enter this country in the year that ended September 30, 1983, 40 percent more than in the previous year. The Border Patrol, an arm of the Immigration and Naturalization Service, has no idea how many managed to elude the presently less than 2500 active border patrol agents. Some believe only a small fraction of those illegally entering are captured. Before this huge wave of the mostly poor—from Mexico, Central and South America, Asia and other countries— lies a land that promises them hope, primarily hope of employment. Unfortunately, the illegal aliens often obtain work at the expense of our own unemployed citizens and, in any event, the low paying jobs all too frequently result in the exploitation of the aliens as well. *See* N.Y. Times, Feb. 13, 1984, at A 12, col. 2. Many of those so entering compound this country's continuing crime problem, particularly with respect to the importation, possession and distribution of narcotics, as the case before us illustrates.

### I. *Background*

Bisram Sugrim, a citizen of Guyana, a small country in northeast South America, was apprehended while illegally in the United States. In the early evening hours of April 16, 1983 two United States Border Patrol Agents were in the Niagara Frontier Transportation Authority Bus Terminal while on a tour of duty in downtown Buffalo, New York. The City of Buffalo borders Canada, and the Buffalo bus terminal is a common place for agents to look for illegal aliens. On this occasion Agents Palacios and Dubay noticed the defendant Bisram Sugrim and his sister Christina Cartagena sitting together inside the terminal. Sugrim had driven in a van from New York City to Buffalo that day, his sister had driven in her own vehicle from Toronto and both vehicles were parked outside the terminal building. After observing the couple for several minutes, the agents approached them for questioning.

In response to Agent Palacios' initial questions Sugrim said that he was a native

and a citizen of Guyana and that he had a green card (proof that one is a resident alien of the United States), which he had left in New York City. In response to similar questions, Cartagena stated that she too was born in Guyana but was a naturalized citizen of Canada and produced a Canadian citizenship card. The agents were perplexed because the card listed two different names—only one of which was Christina Cartagena—and they had never seen one like it before. Upon further questioning, Sugrim admitted that he did not actually have a green card but was only in the process of obtaining one. In response to a question as to where they were going, the answer was that they were travelling in opposite directions toward each other's home city, *i.e.*, Sugrim said he was bound for Toronto and his sister was on her way to New York City.

As a result of this initial interrogation, the agents asked Sugrim and Cartagena to accompany them to a small interview room that the Border Patrol maintained at the bus terminal. There the agents learned that Cartagena's purse contained $24,000 Canadian and $7,000 American bills. Accompanied by one of the agents, Sugrim retrieved his travel bag from his van in the parking lot and carried it into the interview room. When opened, a large quantity of cocaine was found inside it. Sugrim was later indicted and convicted for possession of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). Although his sister had been indicted with him for conspiracy in connection with possession of the cocaine, the trial court granted Cartagena's motion for judgment of acquittal at the close of the government's case and subsequently dismissed the conspiracy count against Sugrim as well.

Sugrim appeals from the judgment of conviction against him in the United States District Court for the Western District of New York (Elfvin, J.) on June 28, 1983 after a jury trial. The only issue raised is the lawfulness of his initial investigative stop by the Border Patrol Agents. We turn to the facts of that investigative stop, which eventually led the agents to discover the cocaine.

## II. *Facts*

Both agents testified at the suppression hearing held in connection with the seizure. Agent Palacios, an officer with seven years Border Patrol experience, stated that after observing Sugrim and Cartagena for two minutes he approached Sugrim and after identifying himself asked the defendant for his place of birth. Palacios testified that his suspicions regarding the couple's citizenship were aroused for several reasons: the pair was sitting alone, without any baggage, in a conspicuous area near the gate for New York City buses; the man was dressed "shabbily" and the woman was "well dressed" and for that reason they did not seem to belong together; and the bus terminal, he added, is a location frequently used for aliens illegally attempting to enter the United States. He further noted that when he first saw Sugrim and his sister he thought that they were the same couple he had stopped the previous night at the airport. Agent Dubay, who has six years of service with the Border Patrol, testified that his duties are to prevent undocumented aliens from coming into the country and to apprehend those who are already improperly here. He said that when he and his partner first saw the Guyanese couple, Palacios had wondered if they were the same people they had checked the night before. Dubay stated that he knew they were not the same couple. The reasons he gave for stopping and questioning Sugrim were similar to those given by Palacios. He too noted the area in the bus station where the couple was sitting, the difference in dress and appearance—the woman dressed "impeccably," the man "rough," "unkempt," "unshaven" —and the knowledge that the bus station is a common place for agents to apprehend aliens.

From this testimony, defendant argues that Palacios and Dubay did not have a reasonable suspicion that Sugrim was an illegal alien so as to permit the initial stop and questioning. The government asserts

that the agents' testimony established specific, articulable facts that led to a reasonable suspicion and provided a proper basis for the initial inquiry. Resolving that issue requires an analysis of the standards governing this kind of detention.

### III. *Discussion*

#### A. *Detention in General*

■■■ The roots of the Fourth Amendment lie deep in the soil of Anglo-American history, *see Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and its terrain has been thoroughly tilled. The Fourth Amendment of course does not prohibit a police officer any more than any other citizen from addressing a question to a person on the street or in a public place. *Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J., concurring). Every encounter between an individual and a party who identifies himself as a police officer does not transform the occasion into a seizure requiring constitutional justification. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). There are a wide variety of reasons for police to speak to individual citizens, such as crowd control, vice and vagrancy offenses, traffic control and juvenile problems. 3 W. La-Fave, *Search and Seizure* § 9.1, at 17 (1978). Having said that, we hasten to add that when a police officer even briefly detains an individual and restrains that person's right to walk away, he has seized that individual. *Terry v. Ohio*, 392 U.S. at 16, 88 S.Ct. at 1877. A detention no matter how momentary is a seizure under the Fourth Amendment. *See Florida v. Royer*, 103 S.Ct. at 1326.

■■■ The test for determining whether a police encounter amounts to a detention is an objective one of deciding whether a reasonable person under all the circumstances would believe he was not free to walk away. *United States v. Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Factors which strongly suggest such is the case are, for example, the display of a weapon, physical touching of the person by the officer and language or tone indicating a show of authority that may compel compliance with the officer's request. *Id.* In *Mendenhall* a young 22 year old black female was approached by two white male Drug Enforcement Administration officers in a busy Detroit Airport. After identifying themselves, they asked to see her identification and airline ticket. Justice Stewart, joined by Justice Rehnquist, voiced his belief that this was not a seizure of Ms. Mendenhall. *Id.* at 555, 100 S.Ct. at 1877.[1] While arguably under that reasoning there was no seizure here of Sugrim, we need not decide that question since the government makes no claim to the contrary.

■■■ We start therefore with the proposition that Sugrim was seized on this occasion by the border patrol agents. To justify a limited and momentary detention of a person without violating the Fourth Amendment's proscription against an "unreasonable" seizure, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879 (footnote omitted). Other cases following *Terry*, which involved a "stop and frisk" for a dangerous weapon, have carried to other situations this exception to the broad, general proscription. *E.g., Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (occupant detained while search warrant of house executed); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (informant's tip that occupant of vehicle carrying narcotics and gun justified forcible detention).

---

1. Justice Powell, joined by Chief Justice Burger and Justice Blackmun, did not reach the question of whether there had been a seizure of the defendant because that issue had not been considered by the lower courts. Justice Powell did not necessarily disagree with Justice Stewart's views on the question, noting only that it was "extremely close." 446 U.S. at 560 and n. 1, 100 S.Ct. at 1880 and n. 1.

**B.** *Detention by Roving Border Patrol*

In the context of a seizure by the border patrol the legal test used to determine the validity of an individual's detention, however brief, varies according to where it occurs and what its purpose is. Detention of a traveller at our borders is justified because of a national interest in self protection; so that the person may be required to identify himself and his effects as lawfully entitled to enter. *See Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Thus, a traveller may be detained or searched at the border absent probable cause or a warrant without transgressing his Fourth Amendment rights because such a detention or search has historically been deemed "reasonable." *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977); Note, *From Bags to Body Cavities: The Law of Border Search*, 74 Colum.L.Rev. 53, 55–56 (1974). From that view it follows that not even suspicion is needed to conduct a routine border search. The same rule with respect to detention and/or search applies at those places considered the functional equivalents of the border. Thus, a traveller landing at O'Hare International Airport in Chicago on a non-stop international flight is subject to a border detention and search. *See United States v. Brown*, 499 F.2d 829 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974).

The standards for a search or detention of an individual at places other than our borders or their functional equivalents differ from those recited for border searches. The Border Patrol in an attempt to deal with the rising tide of illegal aliens apparently uses three types of surveillance along inland highways: permanent check points at certain key intersections, temporary checkpoints established from time to time at various places, and roving patrols. *Almeida-Sanchez v. United States*, 413 U.S. 266, 268, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973). At a permanent checkpoint travellers may not be searched without probable cause, *United States v. Ortiz*, 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975), although they may be detained briefly for questioning even absent individualized suspicion. *United States v. Martinez-Fuerte*, 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976). Logically, therefore, searches at temporary checkpoints by roving patrols may not be conducted on less than probable cause. So, where a roving patrol stopped a Mexican citizen 25 miles from the Mexican border and, without a warrant or probable cause, searched his car thoroughly, the Supreme Court found a Fourth Amendment violation and reversed petitioner's conviction. *Almeida-Sanchez v. United States*, 413 U.S. at 273, 93 S.Ct. at 2539. Thus, decisional law establishes the rule that a roving border patrol may not conduct a search without probable cause.

In this case we are concerned with a roving patrol, yet the intrusion at issue is not a full blown search and seizure requiring probable cause, but rather a brief detention. The Supreme Court dealt with a similar situation in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). There, at a check-point (not open on this occasion) near the Mexican border, two officers watching northbound traffic from the illumination of their headlights pursued and stopped a car solely because its occupants appeared to be Mexican. Although the Court held that particular stop to be unreasonable, it commented that where "an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country," the governmental interest at stake may justify the minimal intrusion of a brief investigatory stop. *Id.* at 881, 95 S.Ct. at 2580. In affirming an order suppressing contraband found in the vehicle the Court, adopting the language of *Terry* and extending its rationale to the enforcement of the immigration laws, held that roving patrols may stop travellers "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who

may be illegally in the country." *Id.* at 884, 95 S.Ct. at 2581 (footnote omitted).

Our decision in *United States v. Barbera*, 514 F.2d 294 (2d Cir.1975) is distinguishable from the case now before us. In *Barbera* the trial court limited itself to a stipulated question as to whether a bus stop in the City of Malone, New York (near the Canadian border) was the functional equivalent of the border. If so, what the trial court termed as the "search and seizure" of Barbera's passport and ticket was to be deemed lawful; if the bus stop was found not to be the functional equivalent of the border, then the search and seizure was unlawful and the motion to suppress had to be granted. Finding that the bus stop in Malone was not the functional equivalent of the border, the trial court granted Barbera's motion to suppress. We affirmed. *Id.* at 296. The scope of the intrusion was not considered or addressed by the trial court, but it seems likely that the stop was more than a limited intrusion since the border patrol agent took Barbera by the arm and escorted him off the bus. Even had it been considered a temporary detention, however, no articulable facts reasonably justifying that kind of seizure were stated. In contrast, the trial court in the instant case did make such an inquiry and decided on the facts before it that the Border Patrol Agents had reasonably justified Sugrim's seizure.

■ In *United States v. Salter*, 521 F.2d 1326, 1328 (2d Cir.1975), we upheld a defendant's conviction for encouraging the entry of illegal aliens. In that case a roving patrol agent in Buffalo stated that while conducting an immigration check on all passengers boarding a Greyhound bus bound for New York City, his suspicions were aroused by the heavy accents of two women escorted by defendant who, in response to an inquiry as to their place of birth, said "Boofalo." Salter did not assert the invalidity of the initial questioning of all the passengers boarding the bus and we, therefore, expressed no opinion on that point. Moreover, the two womens' answers furnished the border patrol agents with specific and articulable reasons to prompt further inquiry of Salter. *See id.* at 1328.

Among the kinds of articulable facts that will reasonably warrant suspicion, the Supreme Court has listed several factors to be considered including the encounter's proximity to the border, the suspect's behavior, mode of dress and haircut and the officer's experience in detecting illegal entry. *United States v. Brignoni-Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–82. Applying those factors to the facts of this case we believe that the government satisfied the burden imposed on it of demonstrating specific, articulable facts justifying Sugrim's seizure during the brief investigative stop. The Niagara Frontier Transportation Authority bus terminal where Sugrim was detained is in Buffalo, New York located in close proximity to the Canadian border. The unrefuted testimony establishes that the public bus terminal is a place where there is traffic in illegal aliens. While Sugrim's and his sister's behavior did not excite suspicion, their mode of dress, the extreme difference in their appearances and the absence of any baggage did. Both officers were experienced in the detection and apprehension of illegal aliens and plainly were entitled to draw on that background in making their decision to question Sugrim. Moreover, the suspicious nature of Sugrim's answers to the initial questions gave the agents sufficient justification to continue the detention in the bus terminal interview room. Since in our view the brief detention of defendant Sugrim did not violate his Fourth Amendment rights, his conviction should be affirmed.

OAKES, Circuit Judge (dissenting):

This is yet another case of extending *Terry* stops [1] to situations never envisaged by the "narrow" exception to the probable cause requirement carved out by that case. As continuously extended, the *Terry* exception swallows up the Fourth Amendment, a

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

danger to which I have previously alluded in connection with, *e.g.*, airport stops, *United States v. Vasquez*, 612 F.2d 1338, 1349 (2d Cir.1979) (dissenting opinion), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980), and searches on the high seas, *United States v. Streifel*, 665 F.2d 414, 425–26 (2d Cir.1981), (dissenting opinion). As pointed out in *Streifel*, this wholesale extension of *Terry* to cover cases in which there is not probable cause, but in which there is a course of organized police conduct (here roving patrols of the Buffalo, N.Y., bus terminal) is simply inconsistent with the Supreme Court's position in *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979), that "[b]ecause *Terry* involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope. *Terry* itself involved a limited, on-the-street frisk for weapons." The fears I expressed in *Vasquez* to the effect that "[i]f airports can support special police conduct, why not other public places—bus terminals, railroad stations, subway stops, restaurants, bars?," are obviously in danger of being transformed from apprehensions to realities at the cost of serious erosion to the Fourth Amendment.[2]

Even while conceding that this case involves a roving patrol, *see Almeida-Sanchez v. United States*, 413 U.S. 266, 268, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973), the majority opinion seeks to avoid the impact of the Supreme Court's decided cases by arguing that this was "not a full blown search and seizure requiring probable cause, but rather a brief detention," opinion at 29, thus calling for application of the standard announced in *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). This might have been true up until the time that the officers asked Sugrim and his sister to step into the small interview room. But at that time, though our record tells us all too little about it, the recent case of *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983), seems to compel a finding that there was a seizure, though as to whether it could or should be characterized as "full blown" in the majority's language I venture no opinion. Once this fact is recognized, our case of *United States v. Barbera*, 514 F.2d 294 (2d Cir. 1975), clearly controls, and requires that we find the agents' actions constitutionally impermissible.

To arrive at the conclusion that there was a seizure, I have to postulate that the INS agents identified themselves by badge or card and that Sugrim and his sister (who was carrying $31,000 in cash in her purse) did not just willy nilly step into a little

---

2. It is true that there is language in the plurality opinion in *Florida v. Royer*, 460 U.S. 491, 497–501, 103 S.Ct. 1319, 1326–29, 75 L.Ed.2d 229 (1983), suggesting that in the airport context, *Terry*-like stops accompanied by a temporary detention of luggage are permissible. *See also United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). This theme was repeated in what some would call dictum in *United States v. Place*, —— U.S. ——, 103 S.Ct. 2637, 2643–44, 77 L.Ed.2d 110 (1983), with respect to the seizure of baggage, though again this was in an airport context ("Because of the inherently transient nature of drug courier activity at airports ...." *Id.* at 2643.) However, nothing in the record before us, except for the agents' asking Sugrim to bring in his bag from his van, indicates any suspicion that he was a drug courier. Unlike the usual airport search cases he is not said to have been nervous, to have been the first (or last) off the plane, to have been looking around, to have baggage with no nametag (he had no baggage with him when first interrogated), to

have paid cash for a ticket, or to have any of the other "indicia" that create "articulable reasonable suspicion." Nor, in the parlance of what INS agents say they are looking for in Buffalo, did the suspects have "baggage with ... stickers from other countries," "foreign accents," or types of clothing or hair cuts identifying them as of foreign extraction.

According to the agents, it was "[n]ot exactly their color" that drew the agents' attention to Sugrim and his sister. Skin color and facial features, I would suppose, are still not facts that would justify a reasonable belief that a person is an alien, even at a bus terminal in the city of Buffalo. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886–87, 95 S.Ct. 2574, 2582–83, 45 L.Ed.2d 607 (1975). As for the agents' assertion that their suspicions were aroused by the sight of a rough, unkempt, unshaven man talking to an impeccably dressed woman, these INS agents would have a field day were they to visit Brattleboro, Vermont, Martha's Vineyard, Massachusetts, or New Haven, Connecticut.

room at the bus terminal with two perfect strangers. This assumption, it seems to me, hardly taxes one's imagination. By then it is clear that Sugrim himself had been asked where he was from, whether he was a United States citizen, where his green card was, and where he had come from and where he was going. His sister had been asked similar questions. Sugrim might even have supposed—this would also not have required a great leap of thought—that these were government agents who were detaining him and his sister when they asked the two to accompany them to the small interview room.

To be sure we do not know how long Sugrim and his sister were detained. Nor do we know the furnishings of the room, what the officers said in the room or other surrounding circumstances, perhaps helpful to this point. *See Florida v. Royer,* 103 S.Ct. at 1326. We do, however, know three things—first, that at some point agent Dubay had gone out and taken a look into the windows of Sugrim's van; second, that Sugrim, accompanied by one of the agents, subsequently went out to the van and brought back to the officers a travel bag containing what the government terms a large quantity of cocaine; and third, that computer checks were run on Sugrim's sister while all this was going on. From the combination of these facts we can surmise that the officers suspected that Sugrim had something in his travel bag and that something was not an illegal alien. We must also surmise that Sugrim went out to the van under compulsion since the government does not justify the search of the bag by consent, a matter as to which it has the burden. *See United States v. Arboleda,* 633 F.2d 985, 993 (2d Cir.1980) (dissenting opinion), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981). It is thus certain that at *some* point prior to Sugrim's retrieval of the bag he was detained, *i.e.,* seized by the agents. He is thus like Barbera in *United States v. Barbera,* which the majority here seeks to distinguish on the unpersuasive basis that that case, but not this, involves "more than a limited intrusion since the border patrol agent took Barbera by the arm and escorted him off the bus."

In my view neither the facts nor controlling law permit the majority to shrink Fourth Amendment protection so as to exclude Sugrim from its cover. The best that the government could argue was that this case "must fall under the umbrella of the border area concept." Since that umbrella reaches "100 air miles from any external boundary," 8 C.F.R. § 287.1(a)(2) (1983) (issued under 8 U.S.C. § 1357(a)(2) (1982)), *see Barbera,* 514 F.2d at 296–97, the "umbrella" is a very broad one indeed, and one whose reach suggests to me that the courts have to be pretty careful before they raise it lest they cast a shadow on the rights of all of us.