UNITED STATES of America

v.

**Philippe DEVAL.**

UNITED STATES of America

v.

**Daniel LUSSIER.**

Cr. Nos. 85–13–01, 85–13–02.

United States District Court,
D. Vermont.

July 1, 1985.

Donald Rendall, Asst. U.S. Atty., Rutland, Vt., for plaintiff.

Sigismund Wysolmerski, Abatiell & Abatiell, Rutland, Vt., for defendant Deval.

Jeffrey Meller, Burlington, Vt., for defendant Lussier.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BILLINGS, District Judge.

This proceeding came before the Court on the motion of defendant Daniel Lussier to suppress the use in evidence of 233.8 grams of hashish taken from his person and on the motion of defendant Philippe Deval to suppress the use in evidence of 98.4 grams of cocaine found between his feet. The following findings of fact and conclusions of law are based on testimony elicited at a suppression hearing held on May 28, 1985, and are found for resolution of this motion only.

For the reasons recited below, both motions are DENIED.

FACTS

On March 29, 1985, Robert LaBelle, an Agent of the United States Border Patrol, conducted a transportation check at the Burlington International Airport in South

Burlington, Vermont. Agent LaBelle has been a border patrol agent for 8 years, and for the last 6 years he has been stationed in Swanton, Vermont. At approximately 6:30 a.m., Agent LaBelle watched passengers deplaning from a People's Express flight that had originated in Newark, New Jersey.

Agent LaBelle noticed an individual, subsequently identified as defendant Pierre Beauvais,[1] who had a deep sun tan, a Canadian-style haircut, and wore a Canadian-type leather jacket and pointed shoes. Agent LaBelle observed that this individual stood approximately 30 feet from the luggage conveyor belt until the time that he retrieved two bags. Beauvais then left the airport with an individual, subsequently identified as defendant Daniel Lussier, who carried three bags.

Based on the foregoing observations, Agent LaBelle believed that the individuals might be aliens illegally in the United States. He decided to confront them. He followed the two individuals to the airport parking lot, and watched them approach a red Mercury Bobcat automobile that carried Quebec registration plates. A third person, subsequently identified as defendant Philippe Deval, sat on the passenger side of the automobile. Deval got out of the car and helped Beauvais and Lussier place their luggage in the trunk and rear seat of the car. All three individuals then sat in the car for a period of several minutes.

During this time, Agent LaBelle went to his unmarked automobile, which was parked approximately 50–75 feet away from the red Mercury. While continuing to observe the defendants, Agent LaBelle used his radio to request a check on the license plate number of the Mercury.

The defendants then got out of their car and looked around the parking lot. Agent LaBelle testified that they appeared nervous at this time. After at least one of the individuals made eye contact with LaBelle, all three began to walk out of the parking lot and toward Airport Drive. Agent La-Belle followed in his automobile. At that time, he received information that several days before the driver of the Mercury had withdrawn his application for entry into the United States at the Champlain, New York point of entry. The reason for the withdrawal was the refusal of the Customs Service to allow the entry of one Philippe Deval, a passenger in the car, because he had a prior criminal record for aggressive and violent behavior.

When the defendants had proceeded almost 200 yards from the airport parking lot, the Agent drove his automobile alongside them. He identified himself as a Border Patrol Agent, showed the defendants a badge, and said that he wished to talk to them. Deval, and then Lussier and Beauvais, approached the vehicle. The Agent then asked Deval where he was from, and he replied "Montreal," and also volunteered that he was a Canadian. The other two individuals nodded assent.

Deval, on request, then gave the Agent an identification card. The Agent recognized the name as that of the automobile passenger who had been denied entry into the United States. Beauvais also gave the Agent an identification card, but Lussier said his identification was still in the automobile in the parking lot. Lussier also stated, on inquiry, that he had a drug record in Canada. He then handed the Agent a birth certificate written in French. The Agent told Lussier that he needed more identification, and LaBelle offered Lussier a ride back to the parking lot.

Beauvais then began to enter the automobile. Agent LaBelle, to protect himself, decided to pat down the defendants before they entered the vehicle. When patting down Lussier, the Agent noted a hard object, the size of a wallet, deep in his right pocket. The Agent also noticed an odor of marijuana. When the Agent asked Lussier what the object was, he made no reply. The Agent then discovered that the package appeared to contain hashish.

---

1. Defendant Beauvais failed to appear for ar-   raignment and for re-scheduled arraignment:

The Agent then placed all three defendants under arrest. He used his only pair of handcuffs to restrain Lussier, and directed Beauvais and Deval to stand, face forward, against his automobile. LaBelle then called the South Burlington Police Department for back-up assistance. Police officers arrived within three to five minutes. No-one searched Deval, but the police officers found between his feet a packet that appeared to contain cocaine. A search of Beauvais revealed a package appearing to be hashish that was hidden in the area around his abdomen. The police officers then took all three individuals into custody and took them to the South Burlington Police station.

## DISCUSSION

The ultimate issue presented by the suppression motions of defendants is whether the actions of the Border Patrol agent violated the defendants' 4th Amendment right to be free from unreasonable searches and seizures. This, in turn, requires the resolution of several discrete issues, including classification of the Border Patrol activity; distillation of the legal standards relevant to the activity; and application of these standards to the facts of the case.

### A. Border Patrol Activity

■ At the border of the United States, Federal agents may, without warrant or even suspicion, detain and search individuals, as courts have deemed such actions historically reasonable within the ambit of the 4th Amendment. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) (national self protection reasonably requires determination of whether person and his belongings may legally enter the country); *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). The same rule applies to those places that are the functional equivalents of the border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1972); *United States v. Brown*, 499 F.2d 829 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974). Recognized functional

equivalents of the border of the United States include an established station near the border, a point marking the confluence of two or more roads that extend from the border, or that portion of an airport where passengers deplane from international flights. *Almeida-Sanchez, supra*, 413 U.S. at 273, 93 S.Ct. at 2539. Since no direct commercial flights from other countries land at the Burlington International Airport, and since South Burlington is not within close proximity to the border, the airport is not the functional equivalent of the border. *See United States v. Barbera*, 514 F.2d 294, 298–99 (2d Cir.1975).

The Border Patrol also enforces the nation's immigration laws through the use of checkpoints, temporary checkpoints and roving patrols to detect the presence of illegal aliens in the United States. *Almeida-Sanchez, supra*, 413 U.S. at 268, 93 S.Ct. at 2537. Although courts have used these terms primarily with reference to the questioning and searches of operators of and passengers in automobiles, the categories are equally applicable to the activities carried out by Agent LaBelle at the Burlington Airport.

■ Since the Border Patrol only conducted "transportation checks" at the airport for some 3–8 hours each week, the airport was clearly not the site of a permanent checkpoint. Here, the periodic foot patrols at the airport resemble the actions of Border Patrol agents who made random checks of the Niagara Frontier Authority Bus Terminal in downtown Buffalo, New York. *United States v. Sugrim*, 732 F.2d 25 (2d Cir.1984). In *Sugrim*, the Second Circuit held that the activities of the agents amounted to a roving patrol. Likewise, this Court concludes that the "transportation check" activities of Agent LaBelle constituted a roving patrol at the airport.

### B. Legal Standards

■ Although roving patrols of border agents may not conduct searches without probable cause, *United States v. Ortiz*, 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975) (probable cause neces-

sary for automobile search at a permanent checkpoint); *Sugrim, supra,* 732 F.2d at 29 (searches at temporary checkpoints by roving patrols may not be conducted on less than probable cause), roving patrols may stop and detain persons for questioning about their citizenship if the agent or agents have a reasonable suspicion that the persons may be aliens. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Border Patrol agents may develop a "reasonable suspicion" based upon, *inter alia,* the mode of dress and hair cut of the individual, the behavior of the individual, and the prior experience of the agents with aliens at the same location. *Id.,* 422 U.S. at 884–85, 95 S.Ct. at 2581–82. Essentially, reasonable suspicion arises from "the specific reasonable inferences which (the agent) is entitled to draw from the facts in light of his experience." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

■ When an agent has properly detained an individual, the agent, to protect his own safety, may make a reasonable search for weapons. Such a search is justified if the circumstances at the time would warrant the belief by a reasonably prudent person that his safety or the safety of others was in danger. *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883.

■ An agent may arrest an individual if he has probable cause to believe that a crime has been or is being committed. *United States v. Ginsberg,* 758 F.2d 823, 827 (2d Cir.1985). Although probable cause is "a practical, non-technical con-

cept," *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), an agent may arrest an individual if the agent has "reasonably trustworthy information ... sufficient ... to warrant a man of reasonable caution in the belief that a crime has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). After an officer has made a legal arrest, he may then conduct a warrantless search of the person and immediate area around the person. *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

### C. Conclusions of Law

■ In this case, the initial 4th Amendment issue arose when Agent LaBelle first stopped Deval, Lussier and Beauvais for questioning. Agent LaBelle initially made contact with the defendants when they were approximately 200 yards outside the airport parking lot.[2] At that time, Agent LaBelle had observed the hair cut, appearance and behavior of Beauvais and the general appearance and behavior of Lussier and Deval. Standing alone, these observations might well have failed to support a constitutional detention of the defendants, as the Agent suspected that the defendants were illegally in the country only because they appeared to be Canadian.[3] *Brignoni-Ponce, supra,* 422 U.S. at 884 n. 9, 95 S.Ct. at 2582 n. 9.

However, before he actually stopped the defendants, the Agent had heard over his radio that the car in which the defendants

**2.** While still in the parking lot, Agent LaBelle made eye contact with at least one of the defendants. Although this contact apparently made the defendants act in a nervous fashion, a reasonable person would not believe, on this basis alone, that he was not free to walk away. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *cf. Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (asking for airline ticket and driver's license not tantamount to any detention).

**3.** Agent LaBelle also testified that he was suspicious because Beauvais stood 30 feet away from

the luggage conveyor and because Lussier and Beauvais between them carried five bags from the airport. This Court finds it difficult to see how these observations could support a suspicion that the defendants were illegally in the United States. The Court's difficulty is intensified by the testimony of a Border Patrol agent offered in *Sugrim, supra,* 732 F.2d at 30, that the *absence* of luggage contributed to his suspicion that individuals were illegally in the country. The implication of these statements is that the Border Patrol harbors suspicion of anyone not carrying exactly one article of luggage.

had met had carried, only a few days previously, a passenger who was refused entry at the United States-Canada border. The presence of the car in the United States shortly after this incident, and after the occupants had not pursued their initial application for entry, supported a particularized suspicion of the Agent that at least one of the three individuals might illegally be in the United States. The Agent then identified himself, and temporarily detained the defendants to ask them questions related to the Agent's suspicion that the immigration laws were being violated. *Cf. Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324 (*citing Brignoni-Ponce, supra,* 422 U.S. at 881–82, 95 S.Ct. at 2580–81).

Upon discovering that one of the defendants had the same name as the automobile passenger previously refused entry to the United States, Agent LaBelle had probable cause to suspect that Deval had broken an immigration law of the United States. The information he had heard on the radio, in combination with the voluntary identification, warranted such a belief.

Similarly, when defendant Lussier volunteered the information that he had a drug record in Canada, Agent LaBelle then had a justified and particularized suspicion that Lussier was also present in the United States in violation of the immigration laws. *See* 8 U.S.C. § 1182(a)(9) (aliens who admit having committed a crime involving moral turpitude shall be excluded from the United States); *Royer, supra,* 460 U.S. at 497–98, 103 S.Ct. at 1323–24 (law enforcement officers may approach an individual, ask questions and offer his voluntary answers as evidence in a criminal prosecution).

These facts, known to Agent LaBelle at the time that he patted down Lussier, more than satisfy either the constitutional standards applicable to a *Terry* search or to a search incidental to the making of an arrest based upon probable cause. *Chimel, supra,* 395 U.S. at 763, 89 S.Ct. at 2040. Neither defendant Deval nor defendant Lussier can claim that the acts of Agent LaBelle violated their 4th Amendment right to be free from unreasonable searches or seizures.

The motion to suppress of defendant Philippe Deval and the motion to suppress of defendant Daniel Lussier are each DENIED.

SO ORDERED.