**UNITED STATES of America**

v.

**Scott BEWS and Brian Clark, Defendants.**

**No. CR–89–3C.**

United States District Court, W.D. New York.

June 5, 1989.

Dennis C. Vacco, U.S. Atty. (Michael A. Battle, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for U.S.

Joel L. Daniels and Rosemarie A. Wyman, Buffalo, N.Y., for defendant Scott Bews.

Richard J. Barnes, Buffalo, N.Y., for defendant Brian Clark.

CURTIN, District Judge.

In a two-count indictment returned on January 11, 1989, defendant Scott Bews was charged in Count I with knowingly, intentionally, and unlawfully possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and defendants Bews and Brian Clark were charged in Count II with conspiring to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S. C. § 2. Pending before the court is defendant Bews' motion to suppress the evidence seized as a result of a search of his luggage at the Buffalo International Airport on January 5, 1989.

*Facts*

At approximately 9:45 p.m. on the evening of January 5, 1989, Special Agents of the United States Border Patrol Donald Palacios, Felix Cwynar, and John Crocitto were on the upper level of the West Terminal of the Buffalo International Airport when they observed passengers deplaning from an Eastern Airlines flight arriving

from Fort Lauderdale, Florida, and Atlanta, Georgia. The agents spotted defendant Bews, who is described as a white male in his early 20s, approximately 5'9" tall, with brown hair, accompanied by defendant Clark, a white male in his early 20s, approximately 5'7" tall, with blonde hair. At the time, Bews was wearing blue jeans and a purple jacket with an insignia on it with crossed hockey sticks and the words "Fort Erie." Clark was wearing a white shirt and white pants, and had a gold chain around his neck. The agents followed the defendants to the baggage claim area located on the lower level of the West Terminal. When the agents reached the baggage claim area they split up, but each continued to observe both defendants, and each noticed defendant Clark looking in Agent Cwynar's direction.

After talking to Bews at the baggage carousel for some time, Clark retrieved a grey travel bag and a plastic bag from the baggage carousel and exited the area alone. Agents Palacios and Cwynar then approached Clark and identified themselves as U.S. Border Patrol agents. They asked Clark about his citizenship and requested him to produce identification. Clark responded that he was a Canadian citizen residing in Fort Erie, Ontario, and produced his birth certificate and what appeared to be part of an expired Ontario driver's license. When asked by the agents where he had been and the purpose of his trip, Clark responded that he was returning from Fort Lauderdale where he had gone to look at real estate. He also stated that he was traveling alone.

At that point, defendant Bews left the baggage claim area without any luggage and walked toward the location where Agents Palacios and Cwynar were questioning Clark. Palacios stopped Bews, identified himself as a Border Patrol Agent, and asked him about his citizenship. Bews responded that he was a Canadian citizen residing in Fort Erie, and produced his Ontario driver's license as identification. Upon further questioning, Bews stated that he, too, was returning from Fort Lauderdale and was traveling alone. Palacios then asked Bews if he could see his plane ticket, to which Bews responded that he did not have it on his person. Agent Crocitto then rejoined the other two agents. Palacios handed Bews' driver's license to Crocitto, who took Bews to an area along the wall of the baggage area, approximately 30 feet away, for further questioning.

Palacios continued to question Clark, and asked him if he could see his plane ticket, whereupon Clark produced his ticket stub and boarding pass. Upon inspection, Palacios noticed that Clark had also handed him Bews' ticket stub and boarding pass. Palacios asked Clark why he would have Bews' boarding pass if he and Bews were not traveling together, to which Clark responded that he did not know. Palacios testified that, based on this contact with Clark, he was not satisfied that Clark had properly identified himself. He also was not satisfied that Clark was traveling in the United States for a proper purpose. He asked Clark to step to the side, out of the way of the general public, and then asked Clark if he would allow him to look through his travel bag. Clark allowed the search, which revealed several books, magazines and articles of clothing, but no contraband. The propriety of this search is not at issue here.

Meanwhile, Agent Crocitto was conducting a separate questioning of defendant Bews. He asked Bews about his association with defendant Clark, to which Bews responded that he had known Clark for several years, but that they were traveling separately and had met by chance in Fort Lauderdale. Bews also told Crocitto that Clark had traveled to Florida to inquire about a job at a tavern owned by a friend of theirs. Crocitto then asked Bews if he had any baggage, to which Bews responded that he did. Bews went to the carousel to retrieve his bag, a small black carry-on, while Crocitto approached Clark to ask him about whether his purpose for traveling to Florida was to seek employment. According to Crocitto's testimony, Clark's response was inconsistent with the information obtained from Bews.

Upon retrieving his bag, Bews returned to the area where all three agents were

talking to Clark. Crocitto asked Bews if he would go back over to the baggage claim area, where there was a table along the wall. He also told Bews that he would want to see what he had in the bag. Bews responded "no problem," and Bews and Crocitto returned to the area where they were previously standing. Crocitto informed Bews that he was not required to let him look in his bag, but Bews indicated to the agent that he had nothing to hide. Bews placed his bag on the table, and at Crocitto's instruction began removing items from the bag, one of which was a rolled-up pair of jeans. When Bews put the jeans to one side, Crocitto noticed what appeared to be a piece of brown plastic sticking out from inside the jeans, and asked Bews what it was. Bews responded that it was cocaine. Crocitto then instructed Bews to place all the items, including the jeans, back in the bag, and requested Bews to accompany him to the Niagara Frontier Transit Authority [NFTA] office at the airport for further questioning. Crocitto informed Palacios of his discovery, and requested that Clark likewise accompany him to the NFTA office.

When they reached the office, the defendants were separated and questioned individually. NFTA Officer Thomas Gerace asked Bews for permission to search his bag, and also asked him to sign a consent form. Bews agreed to both requests. Gerace then removed the items from Bews' bag and found several packages containing a white powdery substance. Officer Gerace then advised Bews that he was under arrest, and read him his *Miranda* warnings. Subsequent testing revealed that each package contained cocaine.

At another location in the NFTA office, Clark was being questioned by Crocitto. Upon being informed as to the results of the search by Officer Gerace, Clark admitted that he had traveled with Bews from Canada to Florida and was fully aware of the contents of Bews' bag and the purpose of the trip.

*Arguments*

In support of his motion to suppress, defendant Bews argues that the investigative stop, which eventually led to the discovery of the cocaine, was unlawfully conducted by the Border Patrol agents. According to defendant, the government cannot point to sufficient articulable facts to reasonably warrant the suspicion that he was traveling in the United States for some illegal purpose, and thus his detention was not supported by probable cause as required by the Fourth Amendment. Defendant contends that this "roving border patrol" stop was in reality a search for drugs thinly disguised as a valid immigration interrogation. *See* Item 6, pp. 7–13. Defendant further argues that the search of his bag which uncovered the cocaine was illegal since his consent was not freely given but was the product of his unconstitutional detention and was given solely in submission to the agents' claim of authority. *Id.,* pp. 14–16; *see also* Item 10.

The government responds that the agents' statutory authority to question defendant as to his right to be or remain in the United States, as well as the presence of several articulable facts giving rise to the suspicion that defendant was an alien and may have been traveling in the United States for some illegal purpose, justified the agents' conduct of the investigative stop which eventually yielded the evidence at issue here. *See* Item 7. According to the government, the initial stop of defendant was reasonable since it pertained only to establishing alienage and potential violations of immigration laws, and was of brief duration. Thus, the government argues, the stop was not a "seizure" for the purpose of invoking the protections of the Fourth Amendment. Item 9, pp. 3–7. The government also contends that defendant's mode of dress and hairstyle, his apparent nervousness (and that of his friend, defendant Clark), and the Border Patrol agents' experience are all articulable facts which gave rise to a reasonable suspicion that defendant was an alien and may have been here illegally or for an illegal purpose, and thus the agents were entirely justified in investigating the circumstances that engendered that suspicion. Item 7, pp. 35–38. In the alternative, the government argues that even if defendant was detained for

Fourth Amendment purposes, the requirement of a search warrant obtained on probable cause was waived when defendant voluntarily consented to the search of his bag. According to the government, the totality of the circumstances surrounding the brief investigative stop of defendant clearly demonstrate that the consent to search was freely and validly given without any coercion on the part of the agents conducting the search. Item 9, pp. 9–15.

*Discussion*

Under the circumstances thus presented, the questions for the court in determining the motion to suppress now before it are 1) whether the detention of defendant amounted to a seizure for the purpose of applying the standards for reasonableness under the Fourth Amendment; and 2) if the detention was a seizure, whether defendant validly waived his Fourth Amendment protections by voluntarily consenting to the warrantless search of his travel bag.

*1) Detention of Defendant*

The government claims as statutory authority for stopping individuals at airports within a reasonable distance from the border the powers granted to immigration officers under section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(1), which provides such officers the right, without warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." Since, however, "no Act of Congress can authorize a violation of the Constitution," *Almeida–Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), the court must decide whether, under the circumstances presented, the brief investigative stop of defendant to inquire into his alienage, which led to the discovery of the evidence that forms the basis of the instant motion, was properly conducted under the Fourth Amendment. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 877, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

The Fourth Amendment's protection against unreasonable searches and seizures applies to all seizures of the person, including those that involve only a brief detention short of traditional arrest. *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578; *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–1879, 20 L.Ed.2d 889 (1968). If there is no detention—*i.e.*, no seizure within the meaning of the Fourth Amendment —no constitutional rights have been infringed. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). The test for establishing whether an encounter with law enforcement officials amounts to a detention "is an objective one of deciding whether a reasonable person under all the circumstances would believe he was not free to walk away." *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir.1984); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). As *Terry* and its progeny have established, not all seizures of the person must be justified by probable cause to arrest for a crime, *see, e.g., Sugrim*, 732 F.2d at 28; *see also Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); however, a detention may be "investigative" yet violative of the Fourth Amendment absent probable cause. *Royer*, 460 U.S. at 499, 103 S.Ct. at 1324.

In the context of a detention by the border patrol at a place away from the actual border but "within a reasonable distance from any external boundary of the United States," 8 U.S.C. § 1357(a)(3); *see* 8 C.F.R. § 287.1(a)(2) ("reasonable distance" means within 100 air miles from any external boundary of the United States), the validity of the detention, however brief, varies according to where it occurs and what its purpose is. *Sugrim*, 732 F.2d at 29. A traveler may be detained and/or searched at the border or its functional equivalent absent probable cause or a warrant without violating his or her constitutional rights based on the justification of national self-protection, *see Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *Almeida–Sanchez*, 413 U.S. at 272, 93 S.Ct. at 2539; such a detention or search has historically been deemed to be "reasonable." *United States v.*

*Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). However, detention of a traveler by a "roving border patrol," such as occurred in the instant case, is governed by the standard for investigative stops enunciated in *Terry* which requires that, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted); *see Brignoni–Ponce,* 422 U.S. at 884, 95 S.Ct. at 2581.

> *Terry* departed from traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons.

*Dunaway v. New York,* 442 U.S. 200, 209–10, 99 S.Ct. 2248, 2254–55, 60 L.Ed.2d 824 (1979). Thus, in evaluating the reasonableness of a particular search or seizure by Border Patrol agents checking for aliens who may be traveling in the United States for illegal purposes,

> it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails."

*Terry,* 392 U.S. at 20–21, 88 S.Ct. at 1879–1880. As in *Terry,* the stop and inquiry must be "reasonably related in scope to the justification for their initiation." 392 U.S. at 29, 88 S.Ct. at 1884; or, as the Supreme Court has more recently pointed out in *Royer,* when the official action is a detention "permitted on less than probable cause because of legitimate enforcement interests," the reasonableness requirement of the Fourth Amendment demands that the scope of the detention "be carefully tailored to its underlying justification." 460 U.S. at 500, 103 S.Ct. at 1325. In the context of roving border patrols, that scope has been outlined by the Court in *Brignoni–Ponce:* "The officer may question the [suspected aliens] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." 422 U.S. at 881–82, 95 S.Ct. at 2580–81.

■ Defendant argues that his detention at the airport exceeded the scope of the original justification for the investigative stop—*i.e.,* to determine whether he was an alien traveling in the United States for an illegal purpose—when Agent Crocitto requested permission to view the contents of his travel bag. In light of the standards set forth above, when applied to the totality of the circumstances in this case, the court agrees with defendant's argument. While the agents may have been able to point to specific, articulable circumstances which, in conjunction with the statutory authority granted them under 8 U.S.C. § 1357(a), provided a reasonable basis for the initial stop and questioning as to defendant's alienage and his reasons for traveling in this country, defendant produced sufficient identification and gave reasonable answers to those questions. Even if such information was not sufficient to satisfy the agents' suspicions, however, Agent Crocitto's request to view the contents of defendant's bag was outside the scope of the justification for the initial investigative stop. There is nothing in the record to indicate that Agent Crocitto had probable cause to believe that a search of defendant's travel bag would have uncovered any evidence which would tend to prove or disprove defendant's explanation as to his reasons for traveling to Florida. Moreover, when the *Terry* balancing test is applied to the circumstances of this case, the governmental interest in establishing effective measures to prevent Canadian citizens

from working illegally in this country is outweighed by the nature of the intrusion on the individual liberties of such persons that occurs when they are subjected to Border Patrol agents' requests for consent to search the contents of their luggage. Canadian commerce and travel within the borders of the United States has historically been welcomed and encouraged (as evidenced by the recent trade agreements entered into by the two nations), and the presence of Canadian citizens in Buffalo, either as local visitors or as travelers to other parts of the United States, is not only commonplace but is an important element of Buffalo's economic vitality. These considerations, when balanced against the intrusiveness of the investigative stop at issue here, weigh heavily in favor of a finding that the agents' detention of defendant was unreasonable under the Fourth Amendment.

The government places considerable emphasis on the *Sugrim* case, in which the Second Circuit affirmed a judgment of conviction for possession of narcotics on the ground that the initial investigative stop which eventually led to the discovery of a large quantity of cocaine was constitutionally permissible. The defendant in that case was a citizen of Guyana who was stopped and questioned by Border Patrol agents (among whom was Agent Palacios, one of the agents involved in the instant case) at the bus terminal in Buffalo. When Sugrim failed to produce a "green card" (proof that he was an alien resident), and later stated that he did not have a green card, he was asked to retrieve his bag from his van in the terminal parking lot and was taken to a small interview room at the terminal. The agents searched his bag, in which the cocaine was discovered. The Second Circuit reviewed the record before it and found that the government had satisfied its burden of demonstrating specific, articulable facts to justify Sugrim's seizure during the brief investigative stop. Among those facts were the bus terminal's proximity to the border, the agents' experience in the detection and apprehension of illegal aliens, the suspect's mode of dress and the extreme difference of appearance between Sugrim and his sister (in whose company Sugrim was observed at the bus terminal), the absence of baggage, and the suspicious nature of Sugrim's answers to the agents' questions. 732 F.2d at 30.

The instant case is distinguishable from *Sugrim* in several respects. Sugrim's answers to initial questioning about his citizenship did not satisfy the agents' suspicions that he may have been in the United States for some illegal purpose, suspicions which were later corroborated by Sugrim's admission that he did not have a green card. Defendant Bews, however, produced sufficient documentation identifying himself as a Canadian citizen, and the reasons he gave for traveling in the United States, while not completely consistent with those given by defendant Clark, were certainly reasonable under the circumstances and did not provide Agent Crocitto with the requisite probable cause to further detain defendant and search his travel bag. Moreover, Sugrim's "shabby" appearance (in contrast to his sister's "impeccable" appearance), the absence of luggage, and his evasive answers to the agents' questions, when taken together with the proximity of the bus terminal to the border and the agents' experience in detecting illegal aliens, provided enough articulable circumstances for the court to find that the agents had "sufficient justification to continue the detention in the bus terminal interview room." 732 F.2d at 30. In the instant case, defendant's jacket (and, perhaps, his haircut) clearly indicated to anyone familiar with local geography that defendant may have been from Canada, and thus there was reasonable suspicion to stop and question defendant for the limited purpose of inquiring into his alienage and the reasons for his trip to Florida. Once that purpose was accomplished, and no probable cause was ascertained to justify any further detention and search of defendant's bag, the Constitution required the agents to allow defendant to continue on his way. Their failure to do so resulted in the "seizure" of defendant within the meaning of the Fourth Amendment.

Accordingly, the record reflects no facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by Agent Crocitto's attempt to gain defendant's consent to a search of his travel bag, and thus the government has not demonstrated sufficient justification for continuing the detention of defendant beyond the initial investigative stop. The question remains whether defendant validly consented to Agent Crocitto's request.

*2) Consent to Search*

 When, as in the instant case, a search is conducted without a warrant, probable cause or exigent circumstances, the validity of the search depends on the defendant's purported consent, and the government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. *Royer*, 460 U.S. at 497, 103 S.Ct. at 1323; *Schneckloth v. Bustamonte*, 412 U.S. 218, 233–34, 93 S.Ct. 2041, 2050–51, 36 L.Ed.2d 854 (1973). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048.

As an attempt to satisfy this burden, the government points to the youth, intelligence, and unimpaired mental capacity of the defendant, the defendant's knowledge of his right to refuse consent, the "exemplary" conduct of the agents, the defendant's cooperation throughout the procedure, and the fact that the initial investigative stop took place in the open public concourse of the airport. Further, according to the government, defendant was not placed under arrest until after the contraband was discovered, and was at all times free to leave prior to his giving consent.

My review of the record in light of the totality of the circumstances presented, however, does not reveal a clear indication of voluntariness. Upon receipt of defendant's identification, Agent Palacios handed it over to Agent Crocitto, who retained it while continuing to question defendant. Crocitto still had defendant's identification when he requested consent to view the contents of defendant's bag. Moreover, there is no indication that defendant, as a young Canadian citizen, had any familiarity with his constitutional and statutory rights under the legal system of the United States. Most importantly, as noted above, at the point that Agent Crocitto requested defendant's consent, the detention of defendant exceeded the justification for the original investigative stop. Defendant was thus being illegally detained at the time he gave his consent to search his bag, and "the consent was tainted by the illegality and was ineffective to justify the search." *Royer*, 460 U.S. at 508, 103 S.Ct. at 1329.

Accordingly, for the reasons discussed herein, defendant's motion to suppress the evidence obtained as a result of the investigative stop conducted by the roving border patrol at the Buffalo airport is granted.

The court will meet with counsel on June 6, 1989, at 9 a.m.

So ordered.